ALVARO ORTIZ, Respondent-Appellant, v DIMARCO VALDES-CASTILLA et al., Appellants-Respondents.

First Department, July 5, 1984

APPEARANCES OF COUNSEL

*Robert C. Bernius* of counsel (*Domenick L. Gabrielli* with him on the brief; *Nixon, Hargrave, Devans & Doyle,* attorneys), for appellants-respondents.

*Jack Strauss* for respondent-appellant.

SULLIVAN, J.

Plaintiff Alvaro Ortiz, a producer of theatrical shows for the Spanish-speaking community in the New York metropolitan area, seeks damages for an alleged libel which appeared in the entertainment column of the Sunday magazine section of *El Diario-La Prensa* on October 25, 1981. Named as defendants are Dimarco Valdescastilla, a freelance author who wrote the article and sold it to *El Diario* and under whose by-line the article appeared; Gannett El Diario Subsidiary, Inc., the corporate publisher of *El Diario;* and its parent, Gannett Co., Inc.[1]

Although not specifically mentioned, plaintiff claims that to the readers of *El Diario* he is unmistakeably the producer described in the following article: "The Venezuelan actress Lupita Ferrer had to be assisted in a New York hospital due to an anemic condition provoked by a problem with the producer that brought her to perform in New York. It was because said producer when the contract was over with Lupita, did not want to pay the amount due to her for her work. This was not the luck of her partner, the actor Jose Bardina, because, everyday, at the end of each show, he went to the box office to collect his day's work. Lupita was taken to the hospital by her mother, Yolanda Ferrer. It is a pity, expressed the popular actress, that this happened to me. In the future I will not trust the producers of New York. Writing this note, Lupita has almost recuperated from the headaches she got from coming to perform in New York."

The events leading to the article's publication are uncontradicted. The information contained in the article was gathered by Juan Caballero, an experienced free-lance photographer and author, whose specialty is Hispanic entertainment and whose photographs and articles have been published in a number of Spanish-language publications. At the time of the publication of the article Valdescastilla and Caballero, who had been recommended to Valdescastilla by the editors of a Spanish-language magazine in Puerto Rico for which Caballero had worked before becom-

---

1. The complaint against a fourth defendant, Manuel Bustelo, was dismissed in a prior order.

ing an independent free-lance journalist, enjoyed a long-term professional relationship. Valdescastilla had used Caballero as a photographer and relied upon him as a source of information since approximately 1976. Caballero's information had always proven to be authentic and accurate and Valdescastilla regarded him as a highly reliable and trustworthy source.

Valdescastilla, the author of the article, is also a free-lance writer with extensive journalistic experience. He has been a professional writer for 21 years, and also specializes in Hispanic entertainment. His articles appear regularly in many Spanish-language publications and for the past 10 years he has sold articles to *El Diario*. Prior to this lawsuit, none of his articles had ever been subject to criticism or dispute concerning its truth or accuracy.

In October, 1981, plaintiff staged a theatrical production in New York City in which Ms. Ferrer performed. Valdescastilla asked Caballero to attend the show and to take photographs of her. Valdescastilla also suggested, should the opportunity present itself, that Caballero interview Ms. Ferrer.

Approximately one week later, Caballero met with Valdescastilla and turned over the photographs he had taken of Ms. Ferrer. At that time, Caballero furnished Valdescastilla with the information which later appeared in the article. In recounting the incident, Caballero reported that he had spoken to both the actress and her mother and that he had personally, at Ms. Ferrer's request, taken her to New York Hospital since she was unfamiliar with New York City.

Since Valdescastilla had no reason to doubt the truth and accuracy of the information he received from Caballero, he did not check the story any further. In fact, when Caballero reported to Valdescastilla, Ms. Ferrer had already left New York, presumably for Venezuela. Nor did Valdescastilla telephone plaintiff, whose name he knew, but whom he did not recognize as the unnamed producer involved in the incident.

After speaking with Caballero, Valdescastilla wrote the article, which he then submitted to the Sunday magazine editor at *El Diario*. *El Diario* purchased the article for $25,

and then processed it in accordance with its standard editorial procedures. The article was reviewed by the editor of the Sunday magazine section, who would routinely contact free-lance authors if she had any questions. After this initial editorial review, the article was typed into the computer and sent to the composing room for page makeup. The production manager then edited the final page make-up prior to publication. After these two editorial reviews, the article was published without any change in the text which Valdescastilla had submitted.

Plaintiff thereafter commenced this action without ever demanding a retraction or correction of the article. After completing discovery, he moved for partial summary judgment with respect to liability, whereupon all three defendants cross-moved for summary judgment dismissing the complaint. In support of the motion, plaintiff submitted affidavits from Ms. Ferrer and Mr. Bardina, who was also mentioned in the article, in which each denied making the statements attributed to them. On the other hand, Valdescastilla, in his affidavit, states that after the commencement of this action, he communicated with Ms. Ferrer, who confirmed the truth of what was published. Special Term denied both motions. Defendants appeal.

While we agree that, as this record stands, an issue of fact exists as to whether Valdescastilla may be held liable, the *El Diario* publishers are entitled to summary judgment. Their reliance upon the integrity of a reputable author bars, as a matter of law, a finding of actionable fault against them under New York libel law.

At the outset, we note our agreement with Special Term that, contrary to defendants' argument, the article is susceptible of a defamatory interpretation since it "tends to disparage [plaintiff] in the way of his office, profession or trade." (*Nichols v Item Publishers,* 309 NY 596, 601; see *Four Star Stage Light. v Merrick,* 56 AD2d 767; *Book v Severino,* 51 AD2d 911.) The court must, in the first instance, decide whether the words of which plaintiff complains are susceptible of the meaning ascribed to them. (*Tracy v Newsday, Inc.,* 5 NY2d 134, 136.) If the words are reasonably susceptible of a defamatory connotation, then "it becomes the jury's function to say whether that was the

sense in which the words were likely to be understood by the ordinary and average reader." (*Mencher v Chesley,* 297 NY 94, 100.) The focus of the controversy, on this appeal, however, is not with whether the article is defamatory but rather with whether plaintiff, on defendants' motion for summary judgment, made a factual showing sufficient to defeat their qualified privilege as journalists under the standard enunciated in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196).

While defamation was a tort of strict liability at common law (see *Herbert v Lando,* 441 US 153), the law is now well settled that some degree of fault is required before liability may be imposed upon a newspaper or broadcaster for the publication of a defamatory falsehood. (*Gertz v Robert Welch, Inc.,* 418 US 323; *New York Times Co. v Sullivan,* 376 US 254.) When a public official or public figure sues for defamation he must prove actual malice, that is, knowing or reckless falsehood, before recovery may be had. (*New York Times Co. v Sullivan, supra,* p 280; *Curtis Pub. Co. v Butts,* 388 US 130.) In the case of a private figure, however, a different standard applies. The Supreme Court has held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." (*Gertz v Robert Welch, Inc., supra,* p 347.)

In *Chapadeau* (*supra,* p 199), the Court of Appeals set the New York standard, stating: "[W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." It has been held that "[t]he difference between the 'actual malice' standard utilized in cases involving public officials and the 'gross irresponsibility' standard utilized in cases involving private plaintiffs is relevant only in determining the degree of fault that must be established in order to

defeat the privilege." (*Karaduman v Newsday, Inc.*, 51 NY2d 531, 551.)

■ Defendants argue, citing *Maule v NYM Corp.* (54 NY2d 880), and Special Term found, that plaintiff, by virtue of the extensive advertising of both his name and his shows, is a public figure. Whether plaintiff is a public or private figure — and in our view the record is not sufficiently developed to determine that issue as a matter of law[2] — he has failed to make an evidentiary showing sufficient to justify a trial on the fault issue against the *El Diario* publishers or for that matter, Valdescastilla, except that in the latter's case summary judgment is unwarranted since his proofs are deficient. Notably absent in the record is an affidavit from Valdescastilla's purported source, Juan Caballero, with whom Valdescastilla has been in contact during the progress of this lawsuit. That deficiency in proof, however, does not affect the *El Diario* publishers' right to summary judgment. Valdescastilla, subject to Caballero's confirmation of his account of the article's origin, and *El Diario,* each in turn, relied upon a journalist of known competence and integrity. Absent specific proof that such reliance was substantially improper, the mere fact that the published information might later be proven false is insufficient to justify a trial in this case.

In the case of a private person, if, as already noted, the content of the publication "is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition", the defamed party must show gross irresponsibility. (*Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199, *supra*.) The decision of the *El Diario* publishers to print an entertainment column and to feature an incident involving a well-known Venezuelan actress represents a responsible editorial judgment as to what constitutes a matter of genuine public interest, reasonably related to matters warranting public exposition. As such, it is "sustainable" and ought "not to be judicially second-guessed." (See *Gaeta v New York News*, 62 NY2d 340.) Thus, assuming plaintiff to be a private, and

---

2. Whether the determination of a plaintiff's status in a defamation action should be made by the court or the jury or both is an unresolved issue in this State. (See *Maule v NYM Corp., supra,* pp 881-882, n.)

not a public, figure, the *Chapadeau* "gross irresponsibility" standard applies.

Under either standard — gross irresponsibility or actual malice — however, a publisher is privileged to publish information received from a dependable source of news unless he had, or should have had, substantial reasons to question the accuracy of the information or the *bona fides* of his source. (*Karaduman v Newsday, Inc., supra,* pp 550-551; see, also, *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 382-383, cert den 434 US 969.) In the absence of some other basis upon which to premise liability, such as *respondeat superior,* a publisher who reasonably relies on the investigative reporting of a trustworthy author cannot be deprived of the qualified privilege merely because the report is later determined to be without factual foundation. To deny the publisher his qualified privilege in such circumstances is tantamount to the unconstitutional imposition of liability without fault. Implicit in such a result would be a finding that the publisher should be held liable for the unknown culpability of an author whom the publisher believed to have acted with the utmost care.

*El Diario* had no substantial reason to question the *bona fides* of Valdescastilla's article. He had been a professional writer for 21 years; his articles regularly appeared in at least seven Spanish-language publications in addition to *El Diario;* he had sold articles to *El Diario* for 10 years; none of his earlier articles published by *El Diario* had been criticized or disputed; the Ferrer article fell squarely within his expertise; and he was unquestionably perceived by *El Diario* as a writer of integrity.

Dismissal of the action against the publishers of *El Diario* is required for the further reason that the article was editorially reviewed before publication by both the newspaper's Sunday magazine editor and its production manager. As in *Chapadeau (supra,* p 200), where the article was read by the "State desk reporter and the copy reader", the article in this case "was not published until it had been checked by at least two persons other than the writer. This is hardly indicative of gross irresponsibility. Rather it appears that the publisher exercised reasonable methods to insure accuracy."

The qualified privilege under the *Chapadeau* standard has been broadly interpreted. For example, the republication of an allegedly libelous article written by a sports editor for United Press International and disseminated by its wire service was found to be privileged, and summary judgment granted. (*Zetes v Richman,* 86 AD2d 746, 747.) Similarly, a publisher's reliance solely on the statements of a police officer perceived to be dependable "failed to demonstrate the existence of a question of fact" under the *Chapadeau* standard, even though the information supplied by the officer turned out to be erroneous. (*Robart v Post-Standard,* 52 NY2d 843, 845; *Carlucci v Poughkeepsie Newspapers,* 88 AD2d 608, 609, affd on other grounds 57 NY2d 883.) In both *Robart* and *Carlucci,* summary judgment was granted without any evidence of the reliability of the sources involved. In neither case did the reporter know even the name of the alleged police officer with whom he had spoken, and neither reporter verified the erroneous information with a second source. In both cases, the only evidence relating to the sources was a statement to the effect that the reporters, following normal procedure, had spoken to individuals whom they believed to be police officers. Here, not only did Valdescastilla and *El Diario* follow their normal procedures, but the record contains additional evidence affirmatively establishing the integrity of their respective sources. Indeed, by comparison, summary judgment is more appropriate here than in *Robart* or *Carlucci.*

As for Valdescastilla, the record indicates that he had a right to rely upon information given to him by Caballero, an author and photographer known to him to have an expertise in the area of Spanish-speaking entertainers and entertainment, and one whose works had been published in many Spanish and English periodicals. Caballero had originally been recommended to Valdescastilla by the editors of a magazine published in Puerto Rico, and Valdescastilla had successfully used him as a source of published news in the past. Caballero told Valdescastilla that he had met with Ms. Ferrer and her mother, and stated he had taken the actress to the hospital. His photographs of the actress confirmed that the meeting had taken place.

■ While plaintiff argues that Valdescastilla should have checked the accuracy of Caballero's story, nothing in the record suggests that Caballero had any reason to submit a false report. Valdescastilla's reliance upon an experienced writer whom he believed to be credible was reasonable. Thus, on his version of the events leading to the preparation of the article, he, too, would ordinarily be entitled to summary judgment since his conduct in the circumstances could not be considered grossly irresponsible. Since, however, Valdescastilla's account turns on the existence of an interview of Ms. Ferrer by Caballero, as part of his burden to "lay bare and reveal his proofs" (*Di Sabato v Soffes,* 9 AD2d 297, 301) he should have submitted an affidavit from Caballero, with whom he is in contact, as part of his proof. No excuse has been offered justifying his failure to do so. If the issues were tendered at trial in the same posture, and Valdescastilla failed to call Caballero, plaintiff would be entitled to the benefit of an adverse inference that Caballero would not have corroborated Valdescastilla. (*Perlman v Shanck,* 192 App Div 179, 183.)

■ Any shortcoming in Valdescastilla's proofs does not, however, serve to enhance plaintiff's case against the *El Diario* publishers in the absence of proof that they "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199 *supra*), if plaintiff is viewed as a private person, or that they "had or should have had serious doubt as to the truth of the publication", if he is considered a public figure. (*James v Gannett Co.,* 40 NY2d 415, 424.) The *El Diario* publishers cannot be held accountable on a theory of *respondeat superior* for the actions of either Caballero or Valdescastilla, since neither was their employee or agent. (See, generally, *Karaduman v Newsday, Inc.,* 51 NY2d 531, 553, *supra*.) Caballero was a free-lance photographer and reporter. Valdescastilla was a free-lance writer who was paid only for articles which *El Diario* accepted and published. Although he held a part-time job at *El Diario* on Sunday evenings as a makeup editor, his duties were totally unrelated to his free-lance articles.

The dissent argues that the *El Diario* publishers are not entitled to summary judgment because eventually their case turns on the reliability, not of Valdescastilla or Caballero, but of Ms. Ferrer who, emotionally distraught and embittered at the time she was interviewed by Caballero, was a person of questionable trustworthiness. Even if this were so, Ms. Ferrer, as the victim of plaintiff's alleged broken promises and a party to the incident described in the article, is a much more reliable source than a third party — no matter how trustworthy in the past — whose information is nonetheless hearsay. Moreover, the article reported that Ferrer's emotional distress was caused by plaintiff's refusal to honor his commitments, as Ms. Ferrer had told Caballero. Caballero had taken Ferrer to the hospital, and thus had an opportunity to observe her demeanor and could have, not unreasonably, concluded that she was telling the truth and that her emotional state was the result of plaintiff's mistreatment of her. Nothing in the record indicates that Caballero was grossly irresponsible in believing Ferrer, or in not attempting to confirm elsewhere a story to which, in large measure, he himself was a witness. It should be noted that, even now, plaintiff does not contend that Caballero was derelict in his journalistic responsibilities in accepting the tale of an emotionally distraught and embittered person. He simply denies that Ferrer ever told Caballero that which is attributed to her. Thus, journalistic credibility, not competence, is really the ultimate issue here. In any event, even under the less stringent standard applicable to a private person, the burden remains with plaintiff to establish gross irresponsibility, which he has failed to demonstrate in the circumstances presented.

In sum, whether plaintiff be considered a public or private figure, the *El Diario* publishers, absent proof demonstrating, at the very least, that they acted in a grossly irresponsible manner in printing Valdescastilla's article, are entitled to summary judgment on the basis of privilege. After completing his discovery, plaintiff has failed to come forward with such proof. Instead, he offers "[n]othing but conclusory assertion", a wholly insufficient basis upon which to impose fault. (*Friends of Animals v Associated*

*Fur Mfrs.*, 46 NY2d 1065, 1068.) As the court noted in *Hurley v Northwest Pubs.* (273 F Supp 967, 974, affd 398 F2d 346), in granting summary judgment to the defendant where a qualified privilege obtained, "A mere chance that somehow, somewhere, on cross examination or otherwise plaintiffs will uncover something which might add to their case but obviously of which now they have no knowledge, is mere speculation and conjecture and is not sufficient in view of the showing made here by the defendant."

Courts "must not be reluctant to apply the ordinary rules governing summary judgment in libel cases such as this, since '[t]he threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself' ". (*Karaduman v Newsday, Inc.*, 51 NY2d 531, 545, *supra*, citing *Washington Post Co. v Keogh*, 365 F2d 965, 968, cert den 385 US 1011.)

Accordingly, the order appealed from should be modified, on the law, without costs or disbursements, to grant the *El Diario* publishers' cross motion for summary judgment dismissing the complaint and, except as thus modified, affirmed.

SANDLER, J. (dissenting in part). The facts are fully and fairly set forth in Justice Sullivan's opinion for the court. Much that is said in that opinion seems to me an admirable treatment of several of the difficult, close questions presented. My fundamental point of disagreement is with the interpretation, as applied to this case, of the governing standard set forth by the Court of Appeals in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199), with regard to media publication of a defamatory article concerning someone who is not a public official or a public figure: "[W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

In granting the motion of the defendant *El Diario-La Prensa* to dismiss the action, the court has in effect held that the publisher of a defamatory news story relating to a private individual is entitled to dismissal as a matter of law under *Chapadeau* (*supra*) if the writer of the story was known to the publisher to be a responsible and trustworthy person, even though it is apparent on the face of the story that it was based entirely on the unverified statement of a person of unknown reliability engaged in a bitter controversy with the person allegedly defamed. (Cf. *Gaeta v New York News,* 62 NY2d 340.)

As so applied, it is difficult to perceive any meaningful distinction between the *Chapadeau* standard and the standard of actual malice enunciated by the Supreme Court with regard to public officials and public figures (*New York Times Co. v Sullivan,* 376 US 254; *Curtis Pub. Co. v Butts,* 388 US 130), although it is apparent both from a textual analysis of the two standards, and the authorities interpreting them, that a significant difference was intended. Indeed, as construed in the court's opinion, it may be persuasively argued that *Chapadeau* perplexingly provides with regard to defamatory articles concerning private citizens even greater protection for media defendants than they enjoy under the *Sullivan* standard with regard to public officials and public figures, since the Court of Appeals pointedly noted in *Karaduman v Newsday, Inc.* (51 NY2d 531, 544, 545) that the "objective" *Chapadeau* standard more readily lends itself to dismissal of libel actions on motions for summary judgment than does "that most exacting standard" set forth in *Sullivan* (*supra*).

The court's opinion appropriately emphasizes that the defendant *El Diario-La Prensa* could reasonably have relied upon the competence and integrity of the defendant Valdescastilla, and that he could in turn have reasonably relied upon the integrity of his immediate source, Juan Caballero. Little, however, is said in the court's opinion about the reliability of the original source of the story, the actress Lupita Ferrer, although it was known to Valdescastilla, and must have been apparent to the publisher, that the story was entirely based on what she said. The little that is said seems to me singularly unpersuasive as support for the conclusion reached.

It is suggested that she was at least familiar with the facts concerning which she allegedly made the comments reported in the paper. But surely, without more, it is not sufficient to establish, as a matter of law, that the publication of a defamatory news story was in accord with responsible journalistic practices that the source of the defamatory story was in a position to know the facts. Indeed, it is not even clear that Ms. Ferrer knew the relevant facts since, for all that appears in the story, the arrangements allegedly violated by the plaintiff had been entered into by someone acting on her behalf and she was relying on her understanding of an arrangement described by someone else.

The court's opinion further suggests that the photographer and sometimes news gatherer, Caballero, was in a position to evaluate her reliability. But nothing in the story, nor in the affidavits submitted in this record, suggests that Caballero ever undertook to evaluate her reliability.

Apart from that, the record discloses only that Ms. Ferrer was a well-known actress who was emotionally upset and angry at the time she was interviewed. The record discloses no evidence that the parties concerned had any basis for evaluating her reliability. Notwithstanding the obviously damaging impact to the reputation of the plaintiff inherent in the published story, it was published without any effort to check the facts with the plaintiff, or with anyone else, and even without any apparent effort to ascertain the specific arrangements allegedly violated and how they were entered into, so as to permit a judgment as to whether whatever occurred resulted from an honest disagreement rather than a purposeful breach of an obligation.

I know of nothing in this record to support the court's conclusion that the publication of the story in question under the described circumstances was so clearly not a gross departure from the ordinary standards of responsible journalism as to entitle the publisher to dismissal of the action as a matter of law.

Assuming that the published story accurately reported in every particular what Ms. Ferrer said, which she herself

flatly denied in an affidavit, I do not believe that this record permits us to determine as a matter of law that the defendants did not act "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." (See *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199, *supra.*) I know of no authority applying *Chapadeau* that supports the conclusion reached by the court, and I am persuaded that an analysis of *Chapadeau* itself, *Karaduman,* and the body of New York law applying *Chapadeau,* including *Gaeta v New York News (supra),* points to a contrary conclusion.

In construing the standard set forth in *Chapadeau, (supra),* it seems to me important to place it chronologically in the context of the relevant law that had been developed by the Supreme Court at the time *Chapadeau* was decided. As is by now a familiar story, the Supreme Court determined in *New York Times Co. v Sullivan (supra)* that the publisher of a defamatory statement with regard to a public official would not be liable unless it could be proved that it was published "with 'actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co. v Sullivan, supra,* p 280.) This principle was extended to public figures in *Curtis Pub. Co. v Butts (supra),* and then in *Rosenbloom v Metromedia* (403 US 29), the same standard was extended to defamatory articles concerning private individuals involved in a matter of public or general concern. Finally, in *Gertz v Robert Welch, Inc.* (418 US 323, 347), the Supreme Court withdrew from the extension of the *Sullivan* principle set forth in *Rosenbloom v Metromedia (supra),* and concluded with regard to defamatory articles concerning private individuals: "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

In the three years that elapsed between the decisions in *Rosenbloom* and *Gertz* (1971-1974), the courts of this State of course applied the *Sullivan* standard, in accordance with *Rosenbloom (supra),* to defamatory articles with regard to

private persons involved in matters of public or general concern. (See, e.g., *Trails West v Wolff,* 32 NY2d 207.) In applying the *Sullivan* standard, our courts necessarily applied the construction of "reckless disregard" of whether it was false or not set forth by the Supreme Court in *St. Amant v Thompson* (390 US 727, 730, 731): "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

*Chapadeau (supra)* came to the Court of Appeals under somewhat unusual circumstances. *Gertz v Robert Welch, Inc. (supra),* had been decided after the Appellate Division had granted summary judgment dismissing the complaint on the basis of *Rosenbloom v Metromedia (supra).* In *Chapadeau,* the Court of Appeals was required to address the issue of a defamatory news item concerning a nonpublic figure involved in a matter of public concern following the invitation by the Supreme Court in *Gertz* to the State courts "to define for themselves the appropriate standard of liability" in that situation. It is apparent that the standard set forth by the Court of Appeals in *Chapadeau* represented an adaptation of the minority view expressed by Mr. Justice Harlan in *Curtis Pub. Co. v Butts* (388 US 130, 155, *supra*), as to the appropriate standard to apply to a public figure who is not a public official, which would have permitted recovery only "on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

A study of *Chapadeau* (38 NY2d 196, *supra*) makes it clear that the standard there set forth with regard to private individuals was not intended to embrace the rule developed under *Sullivan* (376 US 254) that conditioned liability upon a showing "that the defendant in fact entertained serious doubts as to the truth of his publication." (*St. Amant v Thompson, supra,* p 731.)

The "objective standard" set forth in *Chapadeau (supra)* involves two inquiries. First, what are the standards of

information gathering and dissemination ordinarily followed by responsible parties? Second, did the publisher act in a grossly irresponsible manner without consideration for those standards? Undeniably there are many circumstances in which the apparent reliability of the informant makes it appropriate to publish even a defamatory statement without any further effort at verification. (See, e.g., *Robart v Post-Standard,* 52 NY2d 843, 845; *Gaeta v New York News, supra; Zetes v Richman,* 86 AD2d 746, 747.) In those situations, summary judgment dismissing the complaint was justified because it was clear as a matter of law that the publication was not an extreme departure from responsible journalistic practices. But I perceive nothing in *Chapadeau* that can fairly be construed as sanctioning such dismissal as a matter of law with regard to a defamatory article about a private person, published without any effort at verification, which is based solely on the unsupported statement of a person of unknown reliability, with regard to someone with whom that person has been engaged in a dispute.

In *Chapadeau (supra,* p 200) itself the court emphasized: "The instant article was written only after two authoritative sources had been consulted and it was not published until it had been checked by at least two persons other than the writer. This is hardly indicative of gross irresponsibility." And in *Karaduman v Newsday, Inc.* (51 NY2d 531, 544, *supra*), the Court of Appeals quite clearly distinguished between "that most exacting standard" set forth in *Sullivan* (376 US 254, *supra*), and the standard set forth in *Chapadeau,* which "is capable of being met by wholly objective proof" (51 NY2d, at p 545). "Indeed our standard of 'gross irresponsibility' demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy" (*supra,* p 549).

The authorities cited in the court's opinion in support of the conclusion that liability is here precluded as a matter of law fall into two categories. Several involve applications of the *Sullivan* standard and quite correctly applied the principle set forth in *St. Amant v Thompson* (390 US 727, *supra*). (See *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 382-383, cert den 434 US 969; *James v Gannett Co.,* 40

NY2d 415.) The others, applying the *Chapadeau* standard, were situations in which it was apparent on the face of the record that the publisher did not act " 'in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.' " Thus, in *Robart v Post-Standard* (*supra,* p 845) and *Carlucci v Poughkeepsie Newspapers* (88 AD2d 608, 609, affd on other grounds 57 NY2d 883), the stories were written on the basis of information with regard to arrests given by disinterested police officers. In *Zetes v Richman* (*supra*), the newspaper republished a story written by a reputable U.P.I. reporter which on the face of the story indicated either that the reporter had direct knowledge of that which he was asserting, or that he had conducted a careful investigation before writing the story.

Contrary to the argument advanced by the defendants, the recent opinion of the Court of Appeals in *Gaeta v New York News* (62 NY2d 340, *supra*) does not support their position on this issue. The opinion of the Court of Appeals in *Gaeta* carefully detailed the circumstances which justified the defendants believing the information that was published to be reliable and accurate. The opinion noted (p 351) that the source of the statement had been described as the legal guardian of the person concerned in the story and someone "who had previously furnished accurate information to the Nursing Home Special Prosecutor. Sorrentino's facts about her brother had inherent plausibility, and Kramer had no reason to suspect any animus toward the plaintiff. Kramer herself confirmed Sorrentino's information about the nursing home by a visit there; no information could be secured from the psychiatrists at Creedmoor. * * * There was no reason to doubt the veracity of the information received from Sorrentino, and indeed good reason to believe it was accurate. * * * Given that the reporter had no reason to suspect her source, and that she herself visited the nursing home, no triable issue is raised as to defendants' gross irresponsibility."

Nothing remotely comparable to the foregoing can be found in this record confirming the reliability of the person whose alleged statement was published. Moreover, her

personal "animus" was obvious. The detailed recital in the *Gaeta* opinion of the circumstances confirming the right of the reporter to consider her source reliable at least suggests that more is required under *Chapadeau* (38 NY2d 196, *supra*) than a finding that the reporter did not entertain serious doubts as to the truth of the statements, and that the publication accurately reported what was said.

Implicit in the foregoing discussion is my agreement with the court that the article was susceptible of a defamatory interpretation, and that the defendant was not a public figure.

I am more doubtful as to the correctness of the conclusion that *respondeat superior* here is inapplicable as a matter of law on the disclosed facts in the record, but I consider it unnecessary to reach that issue.

Whether or not it would be a sound principle to sanction dismissal as a matter of law in the kind of a situation presented here is a matter on which reasonable people may obviously disagree, as a study of the varied opinions of Supreme Court Justices in this area convincingly confirms. I do not believe it to be the applicable rule set forth in this State by the New York Court of Appeals in *Chapadeau* (*supra*).

Accordingly, the order of the Supreme Court, New York County (M. Klein, J.), entered on August 15, 1983, denying the cross motion of the defendants for summary judgment dismissing the complaint, should be affirmed.

Milonas and Kassal, JJ., concur with Sullivan, J.; Sandler, J. P., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered on August 15, 1983, modified, on the law, without costs and without disbursements, to grant the *El Diario* publishers' cross motion for summary judgment dismissing the complaint and, except as thus modified, affirmed.