■ JOHN LEWIS, Appellant, v NEWSDAY, INC., et al., Respondents, et al., Defendants. [668 NYS2d 377] —Judgment, Supreme Court, New York County (Shelia Abdus-Salaam, J.), entered August 20, 1996, dismissing the complaint, and bringing up for

review an order, same court and Justice, entered on or about July 18, 1996, which granted defendants' motion for summary judgment dismissing the complaint in an action for defamation, unanimously reversed, on the law, with costs, the motion for summary judgment denied, plaintiff's libel and punitive damages claims reinstated. Appeal from order, entered on or about July 18, 1996, unanimously dismissed, without costs, as subsumed within the appeal from the judgment.

This appeal, involving the alleged libel of a private person in a newspaper article, raises issues as to whether the motion court correctly determined, pursuant to the test stated in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199), that the allegedly offensive articles were arguably within the sphere of legitimate public concern and that defendants did not act in a grossly irresponsible manner by relying on information provided by two professional journalists; whether the motion court correctly concluded that the second published article at issue was not susceptible of defamatory interpretation as a matter of law; and whether the motion court correctly found that the evidence of actual and common-law malice was insufficient to require submission of the issue of punitive damages to the jury.

As to the first issue, the motion court was correct in finding that Newsday's decision to print the articles in question was "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition" (*Chapadeau v Utica Observer-Dispatch, supra,* at 199). At the time the articles were published, the Daily News had been on the brink of collapse for well over a year, with problems of mismanagement, the filing of a bankruptcy petition and a strike, all heavily reported in the media. The human-interest items about plaintiff, a recently retired Daily News Bronx Bureau Chief alleged to be running a personal public relations business out of the closed Daily News Bronx office without management's knowledge, fell well within this first portion of the *Chapadeau* test (*see, Gaeta v New York News*, 62 NY2d 340, 349 ["Determining what editorial content is of legitimate public interest and concern is a function for editors. While not conclusive, 'a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is "newsworthy", may be powerful evidence of the hold those subjects have on the public's attention.' "], quoting *Cottom v Meredith Corp.*, 65 AD2d 165, 170, *lv denied* 46 NY2d 711; *see also, Ortiz v Valdescastilla*, 102 AD2d 513, 518).

The motion court's conclusion as to the second portion of the

*Chapadeau* standard was erroneous, i.e., that defendants did not act in a grossly irresponsible manner, as a matter of law, by relying on the status and reputations of two journalists in deciding to publish the article. The journalists in question were a Newsday editor who had recently left the Daily News and his long-time editor colleague, still employed at the Daily News, who passed along the "bar talk", which became the substance of the article. The Newsday editor, in turn, passed the "story" along to a Newsday reporter, advising her of the source, that two other unnamed acquaintances from the Daily News had told him the same story, and that the Daily News editor considered plaintiff, who had continued working during the Daily News strike, a "scab". The reporter tried to verify the story by telephoning the Daily News Bronx Bureau Office but never spoke to anyone. She attempted to locate plaintiff using telephone directory assistance but there were too many possible listings. She asserted that she did not call the Daily News, since the gist of the story was that it did not know what was going on and that its denial would be meaningless. Thus, the story was never verified. The fact of the matter was that plaintiff had come out of retirement to work on a special Daily News supplement and was using the Bronx Bureau Office with its permission.

Defendants' reliance here was misplaced since the two editors were mere conduits for unverified rumor that neither of them sought to investigate or research; nor did they make any representation that they had done so. Hence, neither Newsday nor its reporter was entitled to rely on them and they were obligated to verify the story themselves. Under the circumstances, triable issues of fact exist as to whether the decision to publish the story about plaintiff was grossly irresponsible.

The cases cited by the motion court and by defendants to support such reliance, *Weiner v Doubleday & Co.* (74 NY2d 586, *cert denied* 495 US 930) and *Rinaldi v Holt, Rinehart & Winston* (42 NY2d 369, *cert denied* 434 US 969), are inapposite because the journalists in those cases had themselves conducted the necessary research and investigation, and the defendant publishers were found entitled to rely, without independent verification, on their work.

The question of whether the second article could be interpreted as defamatory as a matter of law was also erroneously decided by the motion court. A writing is defamatory if it "'tends to expose [a person] to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly

intercourse in society'" (*Rinaldi v Holt, Rinehart & Winston, supra,* at 379). The first article disparaged plaintiff professionally by effectively accusing him of improper use of the Bronx Bureau Office for his personal benefit and of theft of services therefrom, i.e., phones and utilities. The second article, based upon plaintiff's conversation with the reporter after the first article was published, and quoting plaintiff as saying "%@$&!!!!" would lead the typical reader to interpret the use of the typographical characters in that manner to mean that plaintiff immediately unleashed a barrage of unprintable expletives at the reporter, a significant breach of propriety. When considered along with the first article, the impression is arguably created that plaintiff was a boor who might well have engaged in the misconduct alleged. Although society's tolerance for profanity may be greater than in the past, given the context of these publications, it cannot be said that the article was not defamatory as a matter of law (*see, Mahoney v Adirondack Publ. Co.,* 71 NY2d 31, 37 [the phrase " 'get your head out of your &!(!!(&' ", falsely attributed to a football coach, was held to be susceptible to defamatory interpretation]). A question of fact·certainly exists on this issue.

Finally, we find that the motion court erred in determining that plaintiff's claims for punitive damages should be dismissed. Both actual malice and common-law malice must be established to warrant an award of punitive damages (*see, Prozeralik v Capital Cities Communications,* 82 NY2d 466, 479-480). As shown above, the record establishes that material factual issues exist as to whether the articles were published with knowledge of their falsity or with reckless disregard of whether they were true or false, i.e., actual malice (*supra,* at 474 quoting *New York Times Co. v Sullivan,* 376 US 254, 285-286, 279-280). The record also sufficiently establishes that material issues of fact exist as to whether the decision to publish the articles was motivated by ill will directed against him or wantonly, recklessly or in willful disregard of his rights, i.e., common-law malice (*Prozeralik v Capital Cities Communications, supra*). The finder of fact must be allowed to consider the evidence that the reporter's private notes included the notation that plaintiff was a "scab", arguably an indication of animus in this context, and that despite an inability to confirm independently a story known to have originated as "bar talk", it was published anyway. Furthermore, upon plaintiff's denial, the reporter continued her snide, derisive tone in the second article, made no further effort to verify, refused to acknowledge any error and arguably portrayed plaintiff as a boor. On summary judgment, this evidence must be considered "in the light most

favorable to [the] plaintiffs" (*Thanasoulis v National Assn. for Specialty Foods Trade*, 226 AD2d 227, 228). Concur—Sullivan, J. P., Milonas, Rosenberger and Williams, JJ.