*310 OPINION OF THE COURT
Edward J. Greenfield, J.
In this case plaintiff, a New York art conservator and restoration specialist, sues Dow Jones & Company, Inc. (Dow Jones), the publisher of the Wall Street Journal (Journal), for libel for an article published about him and his work on December 24, 1991.
Plaintiff had been engaged by the Stedelijk Museum in Amsterdam to try to repair and restore a valuable abstract expressionistic painting by the noted American artist Barnett Newman, which had been badly slashed by a vandal. Plaintiff was a well-known restorer who was recommended for the job by Newman’s widow. The painting was valued by the museum at over $2,000,000. After numerous on-site inspections in New York, as the restoration work progressed laboriously over a three-year period, the museum’s director enthusiastically approved the final job and authorized a payment to plaintiff of $270,000 plus costs and expenses. However, when the restored painting was returned to Amsterdam, both the museum’s conservator and a Dutch art historian attacked the quality of the work, and accused plaintiff of having ruined a masterpiece. Because of the controversy, alleged samples of paint from the painting were turned over for examination by the Dutch Ministry of Justice’s Forensic Laboratory, which published its detailed report in early December 1991. While the report made technical findings as to the composition of the paint and where it was applied, it drew no conclusions as to the quality of the restoration or whether there had been any fraud. Nevertheless, the detractors were not placated and claimed plaintiff had merely “slapped on ordinary housepaint with a roller brush” and had destroyed the vitality of the painting.
The Wall Street Journal, owned by defendant Dow Jones, reported on the controversy taking place in Dutch art circles with an article impugning plaintiff’s restoration techniques and morality, suggesting he had grossly overcharged for what he did, and that his actions bordered on the criminal. It did not express an opinion as to the aesthetic merits of the art restoration. The article was headlined, “For that Price, Why Not Have the Whole Museum Repainted?” It then went on to suggest that plaintiff had painted over the canvas using an inappropriate type of paint and that this had been corroborated by the Forensic Laboratory, and reported suggestions that perhaps he should be extradited for criminal fraud.
*311 Plaintiff, claiming his professional reputation had been destroyed, sued for defamation and punitive damages. Defendant Dow Jones moved to dismiss the complaint on the grounds that the article constituted pure opinion, that it was a fair report of an official proceeding, that it was not libel per se, and that it followed proper journalistic standards. But this court, in a decision dated November 26, 1993, denied its motion, holding, among other things, that enough had been alleged to warrant a trial on the charge of defamation. The Appellate Division affirmed (Daniel Goldreyer, Ltd. v Van de Wetering, 217 AD2d 434 [1st Dept 1995]), rejecting defendant’s claims of exemption from the scope of libel.
The decision of the Appellate Division affirming the denial of Dow Jones’ prior motion to dismiss sets the stage for this motion. It held that Dow Jones “failed to establish that dismissal was warranted as to it by either the opinion privilege, the Civil Rights Law § 74 privilege, the ‘single instance’ rule, or” under the Chapadeau doctrine of irresponsible reporting. (Daniel Goldreyer, Ltd. v Van de Wetering, 217 AD2d, supra, at 436; see, Chapadeau v Utica Observer-Dispatch, 38 NY2d 196 [1975].) The Court left open the possibility that discovery might disclose that Dow Jones was not grossly irresponsible. If such evidence was developed in discovery, the Court suggested Dow Jones could then make a motion for summary judgment, dismissing the complaint. More specifically, the Appellate Division said that resolution of the issue would depend on “whether proper journalistic practices were followed and whether there was editorial review”. (Daniel Goldreyer, Ltd. v Van de Wetering, at 437.)
Discovery has now been had and a deposition taken of Bob Hagerty, the author of the article. Defendant Dow Jones again moves for summary judgment dismissing the complaint, or, at least, dismissing the demand for punitive damages based on its contention that there can be no dispute but that proper journalistic practices were followed. It also argues that Goldreyer was a “vortex” public figure which, if true, requires that he meet the more stringent standard for liability set forth in New York Times Co. v Sullivan (376 US 254 [1964]), rather than that announced in Chapadeau (supra). Finally, it argues that to be entitled to punitive damages, Goldreyer must prove common-law malice as well as constitutional malice.
With the discovery of the reporter completed there is little dispute about what occurred in this case or that the Journal article tore at the very fabric of Goldreyer’s professional repu *312 tation. That does not mean that liability has been established nor that it is foreclosed. For the reasons that follow, summary judgment would be inappropriate in this case.
The unresolved issue is whether in preparing and publishing the article the Journal “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Chapadeau v Utica Observer-Dispatch, supra, at 199.) The Appellate Division assumed that this would be the standard to apply in this case, but did so without considering whether Goldreyer might be a limited purpose or vortex public figure. (See, Gertz v Robert Welch, Inc., 418 US 323, 351 [1974].) If he qualifies as a limited purpose public figure, Dow Jones would not be held liable unless Goldreyer proved through clear and convincing evidence that the statements were made with reckless disregard as to whether they were false or not. (New York Times Co. v Sullivan, supra, 376 US, at 279-280, 285-286; Rinaldi v Viking Penguin, 52 NY2d 422, 436 [1981].)
The criteria to decide whether Goldreyer is a vortex public figure are set forth in Waldbaum v Fairchild Publs. (627 F2d 1287 [DC Cir 1980]). There must be a public controversy, the outcome of which affects at least some segment of the community in an appreciable way. (Supra, at 1296.) The plaintiff must have been a significant player in the event(s) causing the controversy. (Supra, at 1297.) And the alleged defamatory statement(s) must pertain to plaintiffs role in the event(s). (Supra, at 1298.)
There was a storm of controversy regarding Goldreyer’s restoration of “Who’s Afraid of Red, Yellow and Blue III” in the Netherlands prior to the article in question. Not only had it been widely reported in the Dutch press, it had also been debated by the Amsterdam City Council (the Stedelijk Museum being a publicly supported institution). The controversy had been reported on this side of the Atlantic at least a month before the story appeared in the Journal, albeit as a minor news story. Dow Jones has documented that a brief wire service story about the restoration was repeated in 15 newspapers in the United States prior to December 24, 1991. A more extensive article about the restoration appeared in the New York Times on December 17th, versions of which were then repeated in two other newspapers. Following the story in the Journal, reports appeared in Time magazine and on National Public Radio. Thereafter the story receded to the specialized periodicals catering to the world of fine arts. In the scheme of *313 public affairs, this is not a substantial public airing. On the other hand, it was enough to reach that segment of the community most affected by the issue.
The controversy created by Goldreyer’s accusers had the potential to affect persons in the art world interested in art restoration. Expressed another way, it had the potential to be a public as opposed to a notorious private dispute, a distinction the Supreme Court made clear in Time, Inc. v Firestone (424 US 448, 454-455 [1976] [involving a Fortune 500 couple in a nasty and very public divorce in which the court refused to apply the standard of a public figure]). Although the segment of the community potentially interested in this controversy was relatively small, it was identifiable and extended well beyond the immediate participants to art museums, private collectors, art historians and art conservators throughout the world whose opinions are critical to the values that works of art achieve. In this community, interest in what liberties a restorer should take in painting over an original work was and is significant. But was that the controversy stirred up in this case? It was certainly the one on which the media focused some of its attention at the bidding of Goldreyer’s detractors.
We turn next to Goldreyer’s role in the controversy. Goldreyer is a private art conservator who was hired to restore a painting that was recognized as a significant example of mid-twentieth century abstract expressionism. He did not invite the controversy which surrounded his work nor did he thrust himself to the forefront of it. Rather, he was drawn into the vortex of the storm as he defended his restoration. Although his role in this event was major, it did not take on the characteristic of holding up one side of a debate over the issue whether art restoration should ever include painting over much or all of a work of art. His accusers pushed this issue to the front of the debate, but rather than defend a controversial technique, Goldreyer denied that this is what he did. In this sense, the controversy was much narrower — did he or didn’t he paint over Barnett Newman’s masterpiece? Seen in this light, the controversy only affected this one painting which hardly impacts on the broader community of persons interested in the field of art restoration. Rather, this case is governed by the principles of Mahoney v State of New York (236 AD2d 37 [3d Dept 1997]), a case involving a private contractor who successfully bid on a government construction contract only to be publicly accused thereafter of having ties to organized crime. The Court held that he remained a private person insofar as *314 the appropriate standard to be applied in his libel case, unless he had thrust himself to the forefront of the public controversy, something he did not do simply by denying the allegation. (Supra, at 40.) In our case Goldreyer decidedly did not thrust himself to the forefront of the controversy merely by denying any wrongdoing. Therefore, the Appellate Division fully anticipated that the correct standard to apply is that articulated in Chapadeau (supra).
We turn next to the status of the author of the Journal article, James Robert Hagerty. Dow Jones argues that he was an employee of the Wall Street Journal Europe (European Journal), not the Wall Street Journal itself. This distinction could make the Journal a republisher rather than a publisher and entitle it to rely on Hagerty’s and the European Journal’s reputations for reliability. (Karaduman v Newsday, Inc., 51 NY2d 531, 550 [1980], rearg denied 52 NY2d 899; Ortiz v Valdescastilla, 102 AD2d 513, 516 [1st Dept 1984].) His status is important to plaintiff for another reason. He would like to use his deposition at trial on his direct case and, in order to do so, requests that Hagerty be declared an employee of Dow Jones under CPLR 3117 (a) (2). At the time of his deposition, Hagerty was managing editor of the Asian Wall Street Journal (Asian Journal). Plaintiff established through Hagerty’s deposition that his articles published in any of the three newspapers were owned by Dow Jones. Further, the article in the Journal represents that it is by “Bob Hagerty, Staff Reporter of the Wall Street Journal”. The owners of both the European Journal and the Asian Journal are subsidiaries of Dow Jones. Finally, the offending article appeared in a slightly longer version in the European Journal and was edited by the Journal in ways that may have made it appear even more defamatory. For these reasons, it should not be considered merely a republished article and Hagerty must be deemed an employee of defendant Dow Jones. (CPLR 3117 [a] [2].)
At the heart of Dow Jones’ motion is its contention that Hagerty and the Journal’s editors followed established journalistic practices. In preparing the article Hagerty states he spoke to nine different sources, including other journalists in the Netherlands, one of the critics of the restoration, an official from the Stedelijk Museum, and Ms. van Oostveen, a spokesperson for the Amsterdam Cultural Affairs Commission. From Ms. van Oostveen he received copies of Goldreyer’s letter defending his restoration to Wim Beeren, the director of the Stedelijk and a report from O’Toole-Ewald Art Associates, Inc., *315 experts in art fraud, who gave their forensic opinion supporting Goldreyer’s restoration. He spoke to no one from the Ministry of Justice or its forensic laboratory, and he did not speak to Goldreyer. While the number of persons he spoke to looks impressive and he learned enough to know there were two sides to the controversy, his signal failing was his decision to treat the story lightly, and with derision. Neither Hagerty nor the Journal’s editors saw any need to verify the content of the Ministry of Justice’s forensic report. Nor did they heed the warning signs implicit in the bizarre characterizations of the restoration ostensibly provided by Hagerty’s sources. Defendant’s decision to make sport of the controversy at Goldreyer’s expense also explains the derisive headline and the sarcastic rhetorical questions, both of which paint an image to laypersons that plaintiff was not an artist, but a con artist. The article may be viewed as having slashed at plaintiff Goldreyer’s professional reputation, not unlike the vandal who took a knife to Newman’s masterpiece.
The distillation of all the journalistic defamation cases is that newspapers and other publications are accorded great latitude in their reporting, in the interests of free speech and free press, and their reported stories may properly have a point of view. That does not warrant manipulation of the facts to distort actuality. Thus, the selective reporting of facts, and the deliberate omission of exculpatory or nondefamatory facts to make a “story” at the expense of the subject may indeed be probative on the issues of irresponsibility and malice. The deliberate presentation of selected facts to put the subject in the worst possible light certainly can create an inference of malice and a reckless disregard for the truth. (Rebozo v Washington Post Co., 637 F2d 375 [5th Cir 1981], cert denied 454 US 964.) What is deliberately omitted from a story to distort it may well raise questions of malice for a jury to consider. (Westmoreland v CBS Inc., 596 F Supp 1170 [SD NY 1984].) When there is a question as to whether the challenged story so differed from the source material as to create a false impression, a jury can properly consider whether it is libelous. (Masson v New Yorker Mag., 501 US 496 [1991].)
The deposition of Mr. Hagerty, the reporter in this case, disclosed he picked and chose from the facts contained in his notes in putting together his story. The editors of the New York edition of the Wall Street Journal condensed the story from the Wall Street Journal Europe and wrote a new accusatory headline to lead off the story, and made other changes *316 which appear to have accentuated the damaging aspects of the article.
Judgment of what is proper or what is grossly irresponsible is not essentially different from a judgment as to whether a negligent defendant’s conduct was reasonable under the circumstances. In many cases where the standard of care is known and the facts are not seriously controverted, it would still be inappropriate for the court to substitute its opinion of liability for that of the jury. In this case, there are starkly different views of the conclusions to be drawn from the facts and the court should not short circuit the fact-finding process for the false economy of saving the parties and the court time and expense. Dow Jones seeks safe haven for its reporting by its reliance on other journalists and a government official as sources for its story. Its reliance is misplaced.
Comparison of what the reporter’s investigation did or did not reveal with the actual story that appeared certainly would give a trial jury much to consider on the issue of journalistic irresponsibility, and whether or not the story may have been the very antithesis of objective reporting. Consider these variations and discrepancies:
JOURNAL ARTICLE HAGERTY
Painting valued at $1 million. Newman painting valued in 1984 at 5.4 million guilders (United States $2,204,280). Goldreyer was paid $460,000 for restoration. (46% of painting’s value.) Never saw restoration contract. Never checked. Actual restoration cost 14% of value. Report says, “[Cjanvas completely painted over using an inappropriate type of paint.” Never saw or read forensic report. No source for quote. “Some thought he had used a roller to slap house paint on it.” No source. Omitted. O’Toole-Ewald Report concludes forensic lab report incorrect. Omitted. The artist and his widow approved Goldreyer as the restorer.
*317 Implication of a slap-dash job. Museum personnel observed restoration process on 12 visits. Omitted. Restoration approved by Mrs. Newman, Beeren and DeWilde. Suggestion Goldreyer be extradited. Rumor. No source. Holvast said “It’s only one painting.” Restoration has “riven Amsterdam’s city council for three months”, with implication of criminally outrageous price. Holvast said no evidence City of Amsterdam was cheated. Under these circumstances a triable issue of fact exists whether Hagerty and Dow Jones were grossly irresponsible. (Lewis v Newsday, Inc., 246 AD2d 434 [1st Dept 1998].)
To establish a claim for punitive damages Goldreyer would have to prove constitutional and common-law malice. (Prozeralik v Capital Cities Communications, 82 NY2d 466, 479-480 [1993]; Lewis v Newsday, Inc., supra.) Both can be shown by proving wanton, willful or reckless disregard of whether the statements were true or false. (New York Times Co. v Sullivan, supra, 376 US, at 285-286; Prozeralik v Capital Cities Communications, supra, at 479-480; Rinaldi v Holt, Rhinehart & Winston, 42 NY2d 369, 382 [1977], cert denied 434 US 969 [1977].) If a reasonable jury could find, from the evidence, that malice in the legal sense exists, then issues of fact are presented requiring they be tried. (Misek-Falkoff v Keller, 153 AD2d 841 [2d Dept 1989]; Vasquez v O’Brien, 85 AD2d 791 [3d Dept 1981].)
In reversing a dismissal before trial of a claim for punitive damages, the Appellate Division, First Department, recently held: “The record * * * sufficiently establishes that material issues of fact exist as to whether the decision to publish * * * was motivated by ill will * * * or wantonly, recklessly or in willful disregard of [plaintiffs] rights * * * [D] espite an inability to confirm * * * it was published anyway * * * [in a] snide, derisive tone”. (Lewis v Newsday, Inc., 246 AD2d 434, 437, supra.)
A journalist wields a potent weapon which has the potential to destroy a person’s useful life. While journalists have a *318 protective privilege, the weapon they have with its potential for good or evil should be wielded with at least minimal care and sensitivity when it is stated or implied that an individual is being exposed as an incompetent or a wrongdoer.
The report by Floyd Abrams, noted constitutional expert on freedom of the press, on a questionable story by the Cable News Network about the reported use of nerve gas by the United States military in Laos, as quoted in the New York Times of July 3, 1998 (CNN Retracts Report That U.S. Used Nerve Gas, at A1, cols 2, 4, at A14, col 1), which he characterized as “journalistic overkill”, is particularly applicable: “The CNN broadcast was not fair * * * It showed no fabrication or illegality, but a more subtle process of distortion that began when conclusions outstripped the evidence * * * and was compounded by interviews laced with hypothetical questions and ambiguous answers * * * Fairness must come first. The CNN broadcast was not fair. Information that was inconsistent with the underlying conclusions * * * was ignored or minimized.”
A jury could find a comparable departure from minimal standards of journalistic responsibility based on the deposition disclosures here.
Defendant Dow Jones’ motion for summary judgment is denied. Plaintiffs cross motion to declare James Robert Hagerty to have been an employee of Dow Jones is granted. Plaintiff is entitled, if he chooses, to depose the managing editors of the Wall Street Journal, the editor of page B-l, and the treasurer who signed the responses to the interrogatories.