Rod GEIGER, Plaintiff, Appellant,

v.

DELL PUBLISHING COMPANY, INC. et al., Defendants, Appellees.

No. 83–1202.

United States Court of Appeals, First Circuit.

Argued Sept. 9, 1983.

Decided Oct. 18, 1983.

John E. Sutherland, Boston, Mass., with whom Rosencranz & Sutherland, Boston, Mass., was on brief, for plaintiff, appellant.

Robert M. Callagy, New York City, with whom Satterlee & Stephens, New York City, was on brief, for defendants, appellees.

Before COFFIN, Circuit Judge, FAIRCHILD *, Senior Circuit Judge, and BREYER, Circuit Judge.

COFFIN, Circuit Judge.

Appellant Rod Geiger brings this appeal from an order of the district court, 560 F.Supp. 12, granting summary judgment for the defendant publishing companies in Geiger's diversity defamation suit. In order to set the stage for this appeal we must return to Italy in 1945, to the dawn of the neo-realist film movement. Geiger, a private stationed with the United States Army in Rome, met the Italian film directors Roberto Rossellini and Federico Fellini as they

* Of the Seventh Circuit, sitting by designation.

collaborated on the film *Open City.* Geiger brought the film back in his barracks bag to the United States, where it became the biggest box-office attraction of the season. In 1946 Geiger returned to Italy and participated in the production of a second neo-realist film, *Paisa* (or Paisan), which also enjoyed critical acclaim and financial success in the United States.

In an autobiographical essay called "Sweet Beginnings", first published in 1961, in an Italian magazine, Fellini recounts these events in terms that Geiger considers defamatory. Fellini describes Geiger as a "half-drunk" soldier who stumbled (literally as well as figuratively) onto the set of *Open City.* According to Fellini's account, Geiger misrepresented himself as an American producer when actually he "was a nobody and didn't have a dime".

"Sweet Beginnings" was translated into English and published in the American magazine *Atlas* in 1962. The essay was incorporated in a collection of Fellini's writings published in Germany in 1974. This collection was published in England in 1976 under the title *Fellini on Fellini;* defendants published *Fellini on Fellini* in the United States in April, 1976 and brought out a softcover edition in May, 1977. In January, 1979 Geiger brought the defamation action on which this appeal is based.

Geiger raises three issues on appeal. First, he argues that a book publisher is not a "media defendant" and so should not receive the level of First Amendment protection afforded a newspaper. Second, he argues that because he is not a public figure, the district court erred in requiring him to produce evidence of "gross irresponsibility" on the part of the defendants in order to survive the motion for summary judgment. Third, he contends that defendants had a duty to contact him in order to verify the damaging statements made in Fellini's book.

■ Appellant has not cited any authority, nor are we aware of any, to support his assertion that First Amendment protection for "media defendants" stops short of those who publish books for general distribution.

The parties do not dispute the district court's determination that New York law applies to this case. In *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 416 N.E.2d 557, 435 N.Y.S.2d 556 (1980), the Court of Appeals of New York applied the same defamation standard to publishers of a book in which a series of newspaper articles had been reprinted as it applied to publishers of the newspaper in which the articles had originally appeared. 416 N.E.2d at 566–67, 435 N.Y.S.2d at 566–67. Although appellant cites several cases in which courts have afforded less protection to non-media defendants, none of these defendants were book publishers. *See, e.g., Conley v. Southern Import Sales, Inc.,* 382 F.Supp. 121 (M.D.Ala.1974) (defamatory letter sent to bar association by wig boutique); *Levine v. Kiss,* 47 A.D.2d 544, 363 N.Y.S.2d 101 (1975) (libelous statement in physician's autopsy report); *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.,* Vt., 461 A.2d 414 (1983) (inaccuracies in credit report); *Calero v. Del Chemical Corp.,* 68 Wis.2d 487, 228 N.W.2d 737 (1975) (libelous comments on employer information forms). Appellant's emphasis on *Reliance Insurance Co. v. Barrons,* 442 F.Supp. 1341 (S.D.N.Y.1977), is likewise misplaced. In *Reliance,* the court found that the defendant financial magazine *was* a media defendant and noted that its disclosure function "should not be inhibited by judgments for damages of the sort sought here". 442 F.Supp. at 1345. In short, appellant has not shown that the district court erred in applying to appellees a defamation standard appropriate to media defendants.

The defamation standard that the district court adopted was announced by the Court of Appeals of New York in *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975). In *Chapadeau,* the New York court held:

"where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that

the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." 341 N.E.2d at 571, 379 N.Y.S.2d at 64.

*Chapadeau* does not, as appellant contends it does, address the defamation of a "public figure". Instead, the *Chapadeau* standard applies to private individuals whose activities are "arguably within the sphere of legitimate public concern". *Id.* The Supreme Court announced in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher ... of defamatory falsehood injurious to a private individual". 418 U.S. at 347, 94 S.Ct. at 3010 (footnote omitted). It was in accordance with this authority that the New York Court of Appeals adopted the *Chapadeau* standard. 341 N.E.2d at 571, 379 N.Y.S.2d at 64; *see also Wehringer v. Newman,* 60 A.D.2d 385, 389–90, 400 N.Y. S.2d 533, 536 (1978).

The events Fellini describes in "Sweet Beginnings" are plainly matters "within the legitimate sphere of public concern". The neo-realist film movement had a profound effect on the development of cinema, and *Open City* has been described as "a starting point of neo-realism". P. Leprohon, *The Italian Cinema* 89 (1972). Nor was the effect of neo-realism confined to the cinema. One critic has observed that *Open City* and *Paisa* were "landmarks in the field of events as well as in that of aesthetics". *Id.* at 95. Appellant himself testified that the American Embassy in Italy "considered 'Open City' and [appellant's] role in 'Open City' as the first step toward cultural relations between Italy and the United States". Deposition of April 2, 1981, Appendix at 76. During oral argument, appellant cited *Lerman v. Chuckleberry Publishing, Inc.,* 521 F.Supp. 228 (S.D.N.Y.1981), as evidence that New York's "legitimate sphere of public concern" standard had been narrowly construed. We do not see how this case advances appellant's argument. In *Ler-*

*man,* the court found that "the sexual liberation of actresses in American film" was a matter of legitimate public concern, and it applied the *Chapadeau* standard. 521 F.Supp. at 235.

■ We find no merit in appellant's contention that the *Chapadeau* standard should not be applied to "Sweet Beginnings" because the events described in the essay had taken place thirty years before its publication by defendants. The passage of time is not always sufficient to remove an event from the sphere of public concern. While it is true that some events pass only fleetingly before the public eye, others remain as the objects of enduring interest. That the events described in "Sweet Beginnings" fall into the latter category is demonstrated by the fact that the essay has been published in four different countries over a period of more than twenty years.

■ Under the *Chapadeau* standard, appellant cannot recover unless he demonstrates that appellees "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties". 341 N.E.2d at 571, 379 N.Y.S.2d at 64. Appellant argues that because appellees were not working under the sort of time pressure that commonly affects newspaper publishers, they had a duty to check the veracity of Fellini's damaging statements by contacting appellant before they published *Fellini on Fellini.* He contends that appellees' failure to make this check was "grossly irresponsible". Appellees point out that the passage appellant complains of had been published on four occasions (once in the United States) over a long period without encountering any objection from appellant. Appellees argue that they were entitled to rely on the accuracy of the account given by Fellini (who was a first-hand observer of the events he describes), and on the research of the four intervening publishers, to substantiate the statements concerning Geiger that appear in *Fellini on Fellini.*

The Court of Appeals of New York observed in *Karaduman v. Newsday, Inc., supra,* that a republisher is entitled to rely on the accuracy of previously published statements "absent a showing that the republisher 'had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter' ". 416 N.E.2d at 566, 435 N.Y.S.2d at 565 (quoting *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 366 N.E.2d 1299, 1307, 397 N.Y.S.2d 943, 951, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977)). We do not agree with appellant that the injurious nature of the statements is itself a "substantial reason" to question their accuracy; instead, the publisher must have some reason to believe that the statements are untrue. Although it is true that book publishers are not often under the sort of time pressure that requires them to commit a story to print within the space of a few hours, we note that they operate under economic constraints that prevent their conducting the kind of routine check appellant wishes us to impose on them. A non-fiction work often details events that are long past and describes people who are unavailable to verify the author's statements. To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid.

*The judgment of the district court is affirmed; costs will be borne by the appellant.*