**Adjua Abi NAANTAANBUU, Plaintiff,**

v.

**Juanita ABERNATHY, as Executrix of the Estate of Rev. Ralph David Abernathy, Harper & Row Publishers, Inc., and Daniel Bial, Defendants.**

**No. 90 Civ. 0770 (CHT).**

United States District Court, S.D. New York.

March 19, 1993.

**220**

Boyd & Cave, P.C., Brooklyn, NY (Gail W. Boyd, of counsel), for plaintiff.

Squadron, Ellenoff, Plesent & Lehrer, New York City (Slade R. Metcalf, Dori Ann Hanswirth, of counsel), for defendants.

## OPINION

TENNEY, District Judge:

This libel case arises from statements made about the plaintiff, Adjua Abi Naantaanbuu ("Naantaanbuu"), in a book written by the Rev. Ralph David Abernathy ("Abernathy"). The plaintiff has brought suit against Abernathy, HarperCollins Publishers, Inc., ("HarperCollins") (known at the time of publication and sued as Harper & Row, Inc.), and the editor of the book at HarperCollins, Daniel Bial ("Bial"). This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 (Supp.1992).

Following a denial of their motion to dismiss by Charles S. Haight, Jr., U.S.D.J., the

defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56(b). Because the plaintiff cannot demonstrate the existence of any genuine issues of material fact, the motion is granted as to each defendant.

## BACKGROUND

In 1989, HarperCollins published Abernathy's autobiography, entitled *And The Walls Came Tumbling Down* ("the Book"). Among other topics, the Book discussed Abernathy's close relationship with Dr. Martin Luther King, Jr. ("King"). Abernathy had been with King on the night of April 3, 1968—the night before King was assassinated. The alleged defamation of Naantaanbuu appeared in the framework of Abernathy's discussion about that evening. Abernathy wrote:

> A "friend" of Martin's invited us to have steaks at her house, three of us—Martin, Bernard Lee, and me. When we got there, we found three ladies waiting. Martin's friend had provided dinner partners for Bernard and me, and we had a very heavy meal along with some light conversation.
>
> I was exhausted at that stage of the evening, and since I was a happily married man, I was not particularly interested in developing a closer relationship with my companion. Nor was Bernard Lee, as best I recall. I remember trying to keep up my part of the conversation during the meal and then, when the women went back into the kitchen, beating Bernard to an easy chair with an ottoman and falling fast asleep. When I awoke, I saw an empty living room, except for Bernard stretched out on the sofa. Shortly thereafter, Martin and his friend came out of the bedroom. The other women had long since left. It was after 1:00 a.m.
>
> We drove back through the rain, which hadn't slackened all evening, Solomon Jones leaning forward, occasionally wiping off the windshield, which was clouding up on the inside. We didn't talk and by the time we drove back into the motel parking lot, I had long since fallen asleep again, a gift I have always had that has enabled me to keep going for days at a time, without losing much needed energy. Martin, on the other hand, never took catnaps and never ran out of gas.
>
> When we arrived at the motel, the level of his energy would again be tested....

*Id.* at 434 (quoted in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem. in Opp."), at 10–11).

Naantaanbuu's name is never mentioned in the Book. However, she claims to be the "friend" discussed in the passage, and she alleges that a number of people who believed her to be the "friend" contacted her after reading the Book. Affidavit of Adjua Abi Naantaanbuu, sworn to April 30, 1990, attached to Pl.'s Mem. in Opp. at 2, ¶ 9 ("Naantaanbuu Aff.").[1] Naantaanbuu's version of what happened that night differs significantly from Abernathy's account.

King and a number of others came to Memphis, Tennessee in early April in order to participate in a march on behalf of the Memphis sanitation workers union. Naantaanbuu states that she picked up King and other members of the Southern Christian Leadership Conference ("SCLC") at the Memphis airport on April 3. She claims that Abernathy had asked her to provide dinner at her home for the group after a meeting that evening. *Id.* at 2, ¶ 5. Because of poor weather, only a handful of guests attended the dinner party. Deposition of Adjua Abi Naantaanbuu, undated, attached to Pl.'s Mem. in Opp., at 35 ("Naantaanbuu Dep."). Naantaanbuu claims that although Abernathy did lie down and fall asleep in her bedroom after having dinner and at least two drinks, there was no time during the evening at which she and King were alone in the bedroom. *Id.* at 84. It was nearly 3:00 a.m. by the time everyone left her house.

---

1. The defendants argued in a prior motion to dismiss that the passage at issue was not "of and concerning" the plaintiff, since it did not mention her by name. Judge Haight denied the motion, ruling that Naantaanbuu should be given the opportunity to introduce probative evidence on the issue. *See* Opinion of Judge Charles S. Haight, Jr., U.S.D.J., dated October 1, 1990, 746 F.Supp. 378, 382. It is assumed for purposes of this opinion that the disputed passage is "of and concerning" Naantaanbuu.

Daniel Bial ("Bial"), an editor at Harper-Collins, contacted Abernathy in late 1987 about publishing his autobiography. Abernathy was interested in the project, and sent Bial excerpts from his manuscript. Apparently the author and publisher reached an agreement, and by early 1989, Abernathy had submitted the full manuscript. Deposition of Daniel J. Bial, dated July 9, 1991, attached to Defendants' Motion for Summary Judgment, at 30 ("Bial Dep.").

Bial broadly edited the manuscript, and although he was not responsible for a detailed checking of facts in the Book, he did check against other published works for general factual consistency. *Id.* at 61–62. Bial's duties also entailed working with other departments at HarperCollins (including its legal department) and supervising the production process. *Id.* at 6. He asked Abernathy about facts in specific portions of the Book for verification; however, the excerpt at issue here was not among them. Bial also sent advance copies of the Book to Harper-Collins's legal department for a "libel reading." *Id.* at 41. No one at HarperCollins pointed to the excerpt as potentially controversial.

## I. Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Summary judgment may be granted if, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, *no reasonable trier of fact could find in favor of the non-moving party.*" *Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988). Of course, the existence of some factual dispute does not automatically mean that summary judgment will be denied; for the facts in dispute must be material and present a triable issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202

(1986). Moreover, the Supreme Court has said that Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ Naantaanbuu has failed to submit a statement of material facts in accordance with Local Rule 3(g), which requires such a statement in opposition to a summary judgment motion. Consequently, all facts in the defendants' Rule 3(g) Statement are deemed admitted. *Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 163 (S.D.N.Y.1990).

## II. Plaintiff's Status

Depending upon whether a libel plaintiff is a "public figure" or a "private figure," he or she may be required to prove that a defendant acted with "actual malice" in order to recover. The Supreme Court held in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that the First Amendment required a libel plaintiff who was a public official to show that the defendant acted with actual malice in publishing defamatory statements.

The Court expanded the *New York Times* standard to reach all plaintiffs who are "public figures" in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, *reh'g denied,* 389 U.S. 889, 88 S.Ct. 13, 19 L.Ed.2d 198 (1967). In *Butts,* the plaintiff—a college football coach—was deemed a public figure because of his prominence in his profession. In a companion case to *Butts, Associated Press v. Walker,* the plaintiff became a public figure by virtue of "his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." *Id.* at 155, 87 S.Ct. at 1991.

These vague classifications were clarified in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Justice Powell, writing for the Court, fashioned three

categories of libel plaintiffs who were not public officials but who nonetheless were required to prove actual malice in order to recover. The first of these is the extremely rare instance in which an individual "become[s] a public figure through no purposeful action of his own." *Id.* at 345, 94 S.Ct. at 3009. The second type of public figure is one who "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* at 351, 94 S.Ct. at 3013. Finally, and "[m]ore commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* It is the third and final class of public figure plaintiffs into which defendants argue that Naantaanbuu falls.[2]

██ Under the test laid out by this circuit in *Lerman v. Flynt Distributing Co., Inc.,* 745 F.2d 123 (2d Cir.1984), Naantaanbuu cannot be deemed a public figure. In *Lerman,* the Court of Appeals for the Second Circuit specifically defined what constitutes a limited purpose public figure. The court stated:

> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Id.* at 136–37. The court applied these factors to the plaintiff, Jackie Collins Lerman, who was a prominent author on topics dealing largely with evolving sexual mores in society. The court found that Lerman was in fact a public figure with respect to a lawsuit in which the defendant publication had printed her name next to a picture of a nude woman.

Because Lerman had voluntarily written works catering to the "public's interest in sexual mores," she was "deemed to have purposefully surrendered part of what would otherwise have been her protectable privacy rights, at least those related in some way to her involvement in writing her books and screenplays." *Id.* at 137. In considering whether Lerman had injected herself into a "public controversy" related to the defendant's publication, the court noted that "[a] public 'controversy' is any topic upon which sizeable segments of society have different, strongly held views." *Id.* at 138.

The court applied the *Lerman* test, again ruling that the plaintiffs were public figures, in *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612 (2d Cir.), *cert. denied sub nom. O'Reilly v. New York Times Co.,* 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988). The plaintiffs were a group of priests about whom the defendant had published an article; the article reviewed a number of controversies from the priests' pasts. The statements at issue in the lawsuit concerned controversy over their 1971 ordination and their business activities in the mid-1980s. The plaintiffs were deemed limited purpose public figures because they "openly invited media attention" during the early 1970s and prior to that time; they published a syndicated column, produced record albums and performed in concert; they appeared on television and radio shows; and they attracted a great deal of media attention, particularly at the time of the ordinations. *Id.* at 618.

---

**2.** Although neither party addresses the question, we note that Naantaanbuu is not a public figure under either of the remaining two categories in *Gertz.* She is not so widely known that she would be an "all purpose public figure," *see Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013. An "involuntary public figure" is one who has engaged in no purposeful action to become a public figure. Although Naantaanbuu fits that description, her connection with King was too fleeting for her to be an involuntary public figure. Compare *Carson v. Allied News Co.,* 529 F.2d 206, 210 (7th Cir.1976), in which Joanna Carson was deemed an involuntary public figure by virtue of her marriage to Johnny Carson. An informative case is *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736 (1985), where a plaintiff was deemed an involuntary public figure because of his "central role" in a public controversy. This was so despite the fact that plaintiff had assumed that role unwillingly. He had become "embroiled" in the controversy immediately after it occurred. Naantaanbuu, on the other hand, has gone some twenty-five years without being pulled into the controversy over what happened that night.

Before *Lerman* was decided, this circuit held that a plaintiff who opposed fluoridation of public waters was a public figure for purposes of a libel suit over an article criticizing the plaintiff's theories. *Yiamouyiannis v. Consumers Union of the United States, Inc.,* 619 F.2d 932 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). Although the plaintiff had not disputed the district court's finding that he was a public figure, the circuit court nonetheless explained that the plaintiff was "clearly ... a person who has 'thrust' himself 'to the forefront' of a particular public controversy— that pertaining to fluoridation—'in order to influence the resolution of the issues involved,' thereby ... 'invit[ing] attention and comment.' " *Id.* at 938 (brackets in original) (quoting *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009).

In *Grass v. News Group Publications, Inc.,* 570 F.Supp. 178 (S.D.N.Y.1983), also decided before *Lerman,* the defendants sought a preliminary ruling that the plaintiff, Alex Grass, was a limited purpose public figure. The controversy at issue concerned the degree to which a New York gubernatorial candidate, Lewis Lehrman, had been involved in the organizing of Grass's company, Rite Aid. An article about Lehrman—who was Grass's brother-in-law—allegedly contained defamatory statements denigrating Grass's role in the success of Rite Aid.

The court held that the plaintiff was a public figure for purposes of the lawsuit, noting that Rite Aid had sent a number of letters to various publications, at Grass's direction, prior to publication of the allegedly defamatory statements. The letters purported to clarify that Grass contributed far more in starting the company than Lehrman had. As the court pointed out, "[p]rior to the publication of any allegedly libelous statements, Grass authorized what can only be described as a deliberate voluntary plan to monitor the press coverage of the Lehrman campaign in New York State for purposes of 'correcting' all inaccuracies with respect to Lehrman's relation to Rite Aid." *Id.* at 183.

Although the Fourth Circuit has formulated a different test for determining whether a plaintiff is a limited purpose public figure, *see*

*Fitzgerald v. Penthouse Int'l, Ltd.,* 691 F.2d 666, 668 (4th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983), the test includes a requirement of voluntariness akin to that laid out in *Lerman.* The circuit court applied the test in *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703 (4th Cir.1991), and found that the plaintiff, Reuber, was a limited purpose public figure.

Reuber had released certain information, including results of his own research, that created the impression that his employer, the National Cancer Institute ("NCI"), had reversed its official position concerning the safety of a pesticide called malathon. His supervisor reprimanded him for "promoting inadequate research and subverting public confidence in the NCI." *Id.* at 706. A newsletter published most of the reprimand. Reuber sued in the district court and won his defamation and invasion of privacy suit. The circuit court reversed.

The circuit court pointed out that Reuber had "knowingly deploy[ed] himself on the front-lines of debate," *id.* at 710, as to the malathon controversy: he initially disseminated the results of the study that was the subject of the NCI's criticism; he informed interested parties of the availability of the study; and he circulated the results of the study within his office. In short, he was a public figure because he "not only voluntarily injected himself into the malathon controversy by vigorously promoting his own views and research, but did so in a manner that was bound to create confusion over what the official agency position was." *Id.*

The defendants point out that Naantaanbuu has achieved much in her "38 years as a civil rights leader," and she is "well known within her community." Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment at 4. They claim that her affirmative conduct as a civil rights activist makes her a public figure. She has run for an elected office, Naantaanbuu Dep. at 112; she has brought a lawsuit to integrate public parks in Memphis, *id.* at 131; and she was at one time on the Board of Directors of the SCLC, *id.* at 114. She argues, however, that her achievements in the civil rights arena do not make her a

limited purpose public figure for purposes of this lawsuit.

In all the cases above, the "controversy" into which a plaintiff has allegedly entered is defined as the event that the defamatory statements describe. The controversy in this case is not the publication of the Book; nor is it, as the defendants seem to argue, the extent or nature of the plaintiff's role in the civil rights movement throughout her lifetime. Rather, the "controversy" is the question of the events that took place on the last night of King's life. Even expanded, the controversy is at its broadest the question of King's involvement with women outside of his marriage.

■ Obviously "voluntariness" as it relates to a public figure requires a fairly high degree of affirmative conduct on the part of a plaintiff. In *Grass*, for example, the plaintiff entered into a "deliberate voluntary plan"; and in *Lerman*, the plaintiff "purposefully surrendered" a claim to privacy rights. Moreover, the plaintiff's "voluntary" conduct must be behavior relating to "the incident that is the subject of litigation." *Lerman*, 745 F.2d at 136.

The plaintiff's actions and high profile in her community might arguably make her a public figure if this litigation concerned statements made, for example, about the nature of her conduct as a civil rights activist—i.e., the controversy would involve her ability to conduct herself as a civil rights worker, and her actions in the civil rights movement overall might then be relevant. Conversely, if immediately after King's assassination Naantaanbuu had come forward or in any way attempted to make known to the press or to her community at large the events that transpired on the night of April 3, a case could perhaps then be made that she was a limited purpose public figure as to the controversy about what happened that night.

Under the facts of this lawsuit, however, the controversy and the voluntary behavior are not closely connected enough to render Naantaanbuu a limited purpose public figure. After the dinner at her home, Naantaanbuu did not seek out the press or issue statements about what had happened that night. That she sought out the press on matters completely unrelated (running for office, bringing a lawsuit, and defending herself after the Book was released) is immaterial.

Although defendants have not done so here, one might argue that Naantaanbuu voluntarily involved herself with King by having him to dinner at her house; even this behavior, however, would not constitute "voluntariness." In *Clyburn v. News World Communications, Inc.*, 903 F.2d 29 (D.C.Cir.1990), the court considered whether the plaintiff was a public figure where the controversy involved certain articles detailing the plaintiff's relationship with a woman who had died of a drug overdose. The court pointed out that Clyburn's behavior "*before* any controversy arose put him at [the controversy's] center." *Id.* at 33. Clyburn's job brought him in constant contact—officially and socially—with a number of officials. As the court stated,

> [o]ne may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy. Clyburn engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy.

*Id.*

By contrast, Naantaanbuu had only one encounter with King—on the night of April 3—and her behavior can hardly be described as "hobnobbing." She could not have realized that one night spent in King's company would propel her into the public eye. This is particularly true in light of the fact that Naantaanbuu could hardly have known what would happen the next day. King's assassination on April 4 arguably gives the preceding evening greater historical significance. Even so, this fact was completely beyond Naantaanbuu's control, and the lack of voluntary behavior on her part aimed at influencing the debate about what happened on the night of April 3 leads to the conclusion that she is a private figure.

Naantaanbuu's activities fall short of those necessary for her to be a limited purpose

public figure, and she is deemed a private figure for purposes of this lawsuit.

### III.  Standard of Fault for a Private Figure

██  Under New York law, so long as a defendant can demonstrate that the publication at issue is "arguably within the sphere of legitimate public concern," a private figure plaintiff must show that the defendant "acted in a grossly irresponsible manner" in order to recover.  *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 571 (1975). Issues of public concern are those "reasonably related to matters warranting public exposition."  *Id.*  The standard set forth in *Chapadeau* indisputably leaves room for the exercise of editorial judgments, which "will not be second-guessed so long as they are sustainable."  *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802, 805 (1984).

██  Naantaanbuu does not appear to dispute seriously the notion that the passage at issue here involves an issue of legitimate public concern.  She herself notes that

> [t]he incident written about in the book deals specifically with the night before Dr. King's assassination.  This was no ordinary man having an extramarital affair. . . .  This was also not any night in the life of Dr. King, but the night before his assassination.  That fact alone gives that day enormous historical significance.

Pl.'s Mem. in Opp. at 28.

Because of King's death the next day, the events of April 3 in general are clearly matters of public interest.  Moreover, there are those who feel that King's private life bears on his public life; this in turn makes the reports of King's behavior at Naantaanbuu's home a matter of public interest as well. While this notion may sound unnecessarily sordid to some, New York law compels the conclusion that the information contained in this excerpt is a matter of legitimate public concern.

In *Gaeta*, the defendant published an article about the purported wrongful transfer of mental patients.  The writer noted that a particular patient's breakdown was precip-

itated by his son's suicide, which in turn allegedly occurred because the boy's mother (the patient's ex-wife) dated other men. Gaeta—the mother—sued the paper and the reporter.  The Court of Appeals determined that the article itself clearly involved a matter of legitimate public concern, and that the chronology of one patient was "reasonably related" to the article's scope.  *See Gaeta*, 62 N.Y.2d at 350, 477 N.Y.S.2d at 86, 465 N.E.2d at 806.

In *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990), the plaintiff, a psychiatrist, sued a publishing company for libel based on statements made in a book about one of his patients.  He contended that their relationship was outside the realm of public concern.  The book itself was about his former patient's role in her father's murder, which was a matter of legitimate public concern.  The court disagreed with the plaintiff, noting that to carve out a niche protecting only one topic within the article would constitute "the sort of line-drawing that . . . is best left to the judgment of journalists and editors."  *Id.* at 595, 550 N.Y.S.2d at 255, 549 N.E.2d at 457.

Because the passage at issue here, even standing alone, involves an issue of legitimate public concern, Naantaanbuu must show that a genuine issue of material fact exists as to whether each defendant acted with gross irresponsibility in order to defeat this summary judgment motion.

### IV.  Gross Irresponsibility

#### A.  HarperCollins

██  The New York Court of Appeals has defined "gross irresponsibility" as action taken "without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d at 571.  The definition has since been refined to provide that a publisher cannot be held liable upon an unrebutted showing "that the publisher relied upon the integrity of a reputable author and had no substantial reason to ques-

tion the accuracy of the information provided by such source." *Chalpin v. Amordian Press, Inc.*, 128 A.D.2d 81, 88, 515 N.Y.S.2d 434, 439 (1st Dep't 1987). Factors to consider as noted by this circuit include

> whether sound journalistic practices were followed in preparing the defamatory [material] ..., whether normal procedures were followed and whether an editor reviewed the copy ..., whether there was any reason to doubt the accuracy of the source relied upon so as to produce a duty to make further inquiry to verify the information ..., and whether the truth was easily accessible....

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 924–25 (2d Cir.1987), quoting *Hawks v. Record Printing & Pub. Co.*, 109 A.D.2d 972, 975, 486 N.Y.S.2d 463, 466 (3rd Dep't 1985) (citations omitted) (brackets in original).

■ HarperCollins has shown that there was no reason to doubt Abernathy's veracity, and that safeguards were provided in the editorial process. Naantaanbuu, in turn, has failed to produce any material facts—disputed or undisputed—to rebut this showing.

HarperCollins did not have reason to doubt the "accuracy of the information or the *bona fides* of [its] source." *Ortiz v. Valdescastilla*, 102 A.D.2d 513, 519, 478 N.Y.S.2d 895, 899 (1st Dep't 1984). HarperCollins relied on the author's good reputation as a minister and civil rights activist. Affidavit of M.S. Wyeth, sworn to June 1, 1992, attached to Def.'s Notice of Motion ("Wyeth Aff."), at 4, ¶ 13. While Naantaanbuu labels Abernathy a "malicious, libelous liar," Pl.'s Mem. in Opp. at 26, she has not offered any proof that HarperCollins knew or should have been aware of any information prior to the Book's publication that may have portrayed Abernathy in an unflattering light, or that would have given the company reason to doubt his trustworthiness.

The defendants assert in their Rule 3(g) statement that "HarperCollins has had set procedures for the editing and publication of nonfiction works for several years." Defendants' Rule 3(g) Statement at 4, ¶ 37; *see also id.* at 6, ¶¶ 54–56 (explaining that HarperCollins followed "standard procedures

employed for the publication of autobiographical works," and that the legal review to which the Book was subject did not result in anyone questioning the disputed passage). This is undisputed by Naantaanbuu, who has failed to submit a Rule 3(g) statement. Defendants' Rule 3(g) statement confirms that "sound journalistic practices" and "normal procedures" were followed. *See Dalbec*, 828 F.2d at 924–25.

According to M.S. Wyeth, a HarperCollins vice president, "counsel's review is limited to requesting background information on passages which present the risk of claims for libel.... Generally, editors work with our counsel to bring to their attention portions of manuscripts which present a risk of claims being made." Wyeth Aff. at 3, ¶ 9.

■ The company was not obligated to check every single fact in the Book; it had an established editorial procedure to ensure thorough review, and that procedure was adhered to as to the Book.

Naantaanbuu contends that HarperCollins should have foreseen the "danger of injury as a result of the publication." Pl.'s Mem. in Opp. at 31. She urges application of *Udell v. New York News, Inc.*, 124 A.D.2d 656, 507 N.Y.S.2d 904 (2d Dep't 1986), *appeal dismissed*, 70 N.Y.2d 745, 519 N.Y.S.2d 967, 514 N.E.2d 387 (1987), in which a jury verdict for the plaintiff against a newspaper was upheld. The court relied on trial evidence "indicating that [defendant newspaper] had reason to doubt the accuracy of its sources and facts and that the true facts were easily accessible upon proper investigation." 124 A.D.2d at 657–58, 507 N.Y.S.2d at 906.

However, Naantaanbuu fails to distinguish between a journalist's investigative story and an autobiography. The United States Court of Appeals for the First Circuit addressed this difference in *Geiger v. Dell Publishing Co., Inc.*, 719 F.2d 515 (1st Cir.1983), in which a private plaintiff brought suit against a book publisher for allegedly libelous statements in an autobiography published by the defendant. The court stated that although book publishers have more time to verify information than a typical journal or periodical might, nonetheless the publishers

operate under economic constraints that prevent their conducting the kind of routine check appellant wishes to impose on them. A non-fiction work often details events that are long past and describes people who are unavailable to verify the author's statements. To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid.

*Id.* at 518.

Naantaanbuu has not rebutted HarperCollins's showing, made in accordance with Rule 56, that it did not act with gross irresponsibility. Under these circumstances, defendant HarperCollins is entitled to summary judgment.

### B. Bial

█ Naantaanbuu contends that Bial, as the Book's editor, should be held to a high standard of fault, although she does not articulate clearly what that standard should be. *See* Pl.'s Mem. in Opp. at 26–27. In any event, book editors are held to the same standard as a book's publisher—that of gross irresponsibility. *See Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 541, 435 N.Y.S.2d 556, 560, 416 N.E.2d 557, 561 (1980) (quoting *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d at 571.)

Based on Bial's deposition testimony, Naantaanbuu states that Bial knew Abernathy had told different stories about what had happened on the night of April 3 than what he wrote in the Book. *See* Pl.'s Mem. in Opp. at 27 (citing Bial Dep. at 84–87). Plaintiff's own characterization of Bial's deposition testimony, however, is inaccurate. What Bial in fact said at his deposition was that Abernathy had made him aware that certain *other* people—not including Abernathy—had advanced stories about that night which were untrue. *See* Bial Dep. at 85.

While Bial may have realized that a different story was advanced in the past, it was not grossly irresponsible for him to rely on Aber-

nathy's statements, made at the time of the Book's writing, to the effect that Abernathy was now telling the full story. The mere fact that at one time different stories were told about that night is insufficient to cause Bial to "personally ha[ve] reason to doubt the truthfulness" of the material. *Karaduman,* 51 N.Y.2d at 542, 435 N.Y.S.2d at 561, 416 N.E.2d at 562.

Naantaanbuu claims that Abernathy had initially considered deleting the disputed passage, but that Bial persuaded him to leave the passage in. She points to a newspaper article in which it was reported that Bial persuaded Abernathy to retain this section of the Book. *See* Pl.'s Mem. in Opp., Exh. D. Bial had explained at his deposition that although he had read the article discussing the alleged conversation between him and Abernathy about this passage, that information was incorrect (although he did not attempt to contact the author or newspaper to correct that part of the story). Bial Dep. at 93.

█ The production of a single newspaper article (not even reproduced in its entirety), without further supporting evidence, is insufficient to generate an issue of material fact. The article is inadmissible hearsay, *see Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 266 n. 6 (S.D.N.Y.1988), and may not be considered on this summary judgment motion. *See* Fed.R.Civ.P. 56(e); *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

█ Naantaanbuu also contends that Bial had an obligation to investigate Abernathy's story more thoroughly because he was aware that there had been congressional hearings held concerning King's assassination. *See* Pl.'s Mem. in Opp. at 27. She seems to imply that Bial should have made an inquiry "as to what Abernathy might have said about that night in Dr. King's life during the hearings." *Id.* However, the fact that such hearings occurred does not automatically impose an obligation to investigate them. Bial did not have reason to doubt Abernathy's credibility, and he consequently had no further obligation to investigate. *See Ortiz,* 102 A.D.2d at 519, 478 N.Y.S.2d at 899. Moreover, Naantaanbuu has failed to allege that Abernathy in fact said anything in his testi-

mony before the Committee that would have contradicted the version of events he gave in his Book.

Naantaanbuu also asserts that Bial checked other facts in the Book, but did not confirm this passage. As explained *supra* Part IV.A, it is unrealistic to expect a publisher or editor of a book to confirm every single fact. She further asserts that Bial had a particular obligation to check this passage because he knew it to be controversial. *See* Pl.'s Mem. in Opp. at 27. To expect a publisher or editor to investigate every *controversial* statement by an author could cause extreme delay in publishing any work of non-fiction, to a degree that would raise grave First Amendment concerns. *See Geiger,* 719 F.2d at 518. The relevant inquiry is whether an editor or publisher investigated versions of stories that were believed to be *false.*

Naantaanbuu has failed to come forward with sufficient facts material to a determination of gross irresponsibility to show that there is a genuine issue as to Bial's conduct. Accordingly, Bial's motion for summary judgment is granted.

### C. Abernathy

■ The question of whether Abernathy was grossly irresponsible must also be answered in the negative. There is an initial question rarely raised in libel cases, which is whether in the case of non-media defendants the standard of gross irresponsibility applies to the same degree that it does to media defendants. The Supreme Court has not addressed this question. The First Department of the New York Supreme Court, Appellate Division, in *McGill v. Parker,* 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dep't 1992), framed the issue as follows:

> There is no reason ... why the Constitution should be construed to provide greater protection to the media in defamation suits than to others exercising their freedom of speech, ... especially where the non-media defendant uses the media for the publication of matter claimed to be defamatory.... Whatever the applicable standard, *Gertz* holds, there can be no liability without fault.

*Id.* at 108, 582 N.Y.S.2d at 97–98. In *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. 1104 (N.D.N.Y.1992), the district court held that non-media defendants should be treated the same as a media defendant, " '[a]bsent any suggestion to the contrary by the Court of Appeals [in *Chapadeau*]' " that a different standard should apply. *Id.* at 1112 (brackets in original) (quoting *Rupert v. Sellers,* 65 A.D.2d 473, 483, 411 N.Y.S.2d 75, 81 (4th Dep't 1978), *aff'd,* 50 N.Y.2d 881, 430 N.Y.S.2d 263, 408 N.E.2d 671, *cert. denied,* 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 132 (1980)).

Naantaanbuu has not produced sufficient information to demonstrate the possibility that Abernathy acted with some degree of culpable conduct, if in fact his version of events was false. She has come forward with information to make it a genuine issue of fact as to whether Abernathy was telling the truth about the events of the evening of April 3. That is, she produced her own affidavit and that of her sister, both of which contradict Abernathy's version of events.

The fact of the story's falsity is not material, however, because Naantaanbuu has not come forward with any evidence showing fault on Abernathy's part. She has produced no evidence that this court may properly consider on a summary judgment motion that Abernathy told anyone else a different account of that night, or published this account of events with the realization that his recollection was faulty. Such evidence is required where the applicable standard, gross irresponsibility, calls for a showing of fault.

Naantaanbuu alleges that Abernathy has stated in the past that he had merely asked Naantaanbuu on that evening if he could lie down. She cites to the Hearings before the Select Committee on Assassinations of the United States House of Representatives ("the Committee"), which conducted an investigation into King's assassination.

■ The allegations, however, are made in the form of an affidavit by Gene Johnson, who at the time of the hearings was Deputy Chief Counsel of the Committee. Johnson's affidavit is neither signed nor notarized, however, and cannot be considered on a summary judgment motion. *See Burlington*

*Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir.1985). Moreover, defendants submitted in response an affidavit with the testimony of Abernathy at those hearings attached. Abernathy did not speak of the evening of April 3 at any point in his testimony. *See* Affidavit of Dexter E. Chestnut, sworn to August 8, 1992, Exh. A.[3] Evidently Johnson's affidavit refers to interviews not on the record at the hearings. Even if it were signed, however, it would be of little use to this court.

While the evidence above may be probative as to the possible falsity of Abernathy's statements, it does nothing to demonstrate that Abernathy wrote the passage in a grossly irresponsible manner; Naàntaanbuu has not produced any evidence that might show a malicious motive or intent on Abernathy's part, or any evidence that he doubted his own ability to recount the past improperly. Even if Abernathy may have misinterpreted what he saw, that misinterpretation would not rise to the level of gross irresponsibility. *See Simonsen v. Malone Evening Telegram,* 98 A.D.2d 905, 905, 470 N.Y.S.2d 898, 899 (3d Dep't 1983). Accordingly, summary judgment is granted for Abernathy's estate.

## CONCLUSION

For the reasons stated above, the summary judgment motion is granted as to each defendant. Defendants to submit judgment in accordance herewith.

SO ORDERED.

---

**3.** Chestnut is a paralegal at the law firm retained by the defendants. Exhibit A is a copy of Abernathy's testimony before the committee, in its entirety.