NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1242
_____

JOAN CRESCENZ,
                                        Appellant

v.

PENGUIN GROUP (USA), INC.; MICHAEL CAPUZZO
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 11-cv-00493)
District Judge:   Honorable Noel L. Hillman
_____

Argued November 20, 2013
Before:  AMBRO, FISHER and HARDIMAN, *Circuit Judges.*

(Filed: March 26, 2014 )

Clifford E. Haines [Argued]
Danielle M. Weiss
Haines & Associates
1835 Market Street
Suite 2420
Philadelphia, PA 19103
            *Attorneys for Plaintiff-Appellant*

Howard J. Schwartz [Argued]
Wolff & Samson
One Boland Drive
The Offices at Crystal Lake
West Orange, NJ 07052

Nancy A. Del Pizzo
Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman
One Riverfront Plaza
Suite 800
Newark, NJ 07102
     *Attorneys for Defendant-Appellee*

_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

Joan Crescenz appeals the District Court's summary judgment in favor of Penguin Group (USA), Inc. and Michael Capuzzo. We will affirm, essentially for the reasons stated by the District Court.

I

In August 2010, the Penguin Group published *The Murder Room: The Heirs of Sherlock Holmes Gather to Solve the World's Most Perplexing Cases*, a work of nonfiction authored by Capuzzo. The book chronicled the history of the Vidocq Society, an association of forensic professionals and private citizens who solved cold crimes.

A central figure in the book was Frank Bender, a founder of the Vidocq Society and a renowned forensic artist. Well known for his "overt sexuality" and "self-professed sexual exploits," Bender had an "open" marriage with Jan Bender, his wife of more than thirty years. 60A. Appellant Crescenz met Frank Bender in 1975, and worked as his

2

artist's assistant and bookkeeper for almost thirty years. She is married to Peter Crescenz, her husband of more than twenty years, with whom she has three children.

*The Murder Room* contained several passages that suggested Crescenz had a sexual relationship with Bender. On July 28, 2010, after reading a galley copy of the book that Bender had provided her, Crescenz emailed William Shinker, the book's publisher, to complain that she had been portrayed inaccurately. Although Crescenz's email challenged specific facts in Capuzzo's depiction, it did not deny that she had a sexual relationship with Bender. For example, in response to a passage that Bender and Crescenz "made love like clockwork" every Tuesday, Crescenz stated, "There's no every Tuesday like clockwork for anything." 1018A. Similarly, Crescenz took issue with Capuzzo's description that she answered Bender's door bottomless, and that she became "jealous of the other girlfriends." 1020A. To the latter statement, she clarified, "I did NOT spend [the better half of my life] LUSTING after Frank Bender or his notarity [sic], and waste time with unnecessary jealousy for anyone." *Id.* Penguin published the book as scheduled despite Crescenz's concerns.

Crescenz brought suit against Penguin and Capuzzo in the District Court, alleging defamation and false light invasion of privacy. In her complaint, Crescenz denied that she had a sexual relationship with Bender. She also claimed Capuzzo never provided her an advance copy of the book, and if he had, she would have corrected the false statements about her. Crescenz also alleged that Penguin and Capuzzo were negligent and reckless in

3

publishing the statements in light of her July 2010 email to Shinker. Defendants moved for summary judgment, and Crescenz moved for partial summary judgment. Therein, she urged the District Court to analyze her defamation claim under the negligence standard, claiming that she was a private figure and the matter was of private concern. Defendants, on the other hand, argued that the District Court had to find recklessness for liability to attach, as Crescenz was a limited-purpose public figure and their statements were a matter of public concern.

The District Court granted Defendants' motion for summary judgment, and denied Crescenz's motion as moot. In a thorough opinion, the District Court assumed *arguendo* that the lower negligence standard applied, but nevertheless found that Crescenz had not created a genuine issue of material fact as to either Defendant's negligence. It pointed to fourteen uncontested facts to conclude that Capuzzo could have reasonably inferred a sexual relationship: for example, Capuzzo's personal observations of Bender and Crescenz over seven years, Bender's pre-publication statement to Capuzzo that he had a long-term sexual relationship with Crescenz, and Jan Bender's description of Crescenz as Bender's "second wife." Next, the District Court held that Penguin had reasonably relied on the veracity of Capuzzo's work, finding that Penguin was not required under industry custom to independently fact-check an author's work. Because Crescenz failed to provide sufficient evidence of negligence, the District Court found that Defendants were entitled to judgment as a matter of law on her defamation claim. The District Court then noted

4

that because claims for false light require the higher proof of recklessness, Crescenz's second claim failed *a fortiori*.

Crescenz timely appealed.[1]

## II

We exercise plenary review over the District Court's summary judgment. *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 263 (3d Cir. 2006). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). We make all reasonable inferences from the evidence in the light most favorable to the nonmovant. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). The case presents a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, she must identify specific facts and affirmative evidence that contradict those offered by the movant. *Anderson*, 477 U.S. at 256–57.

## A

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction under 28 U.S.C. § 1291.

Under New Jersey law,[2] a "statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *W.J.A. v. D.A.*, 43 A.3d 1148, 1153 (N.J. 2012) (citations omitted). To prevail on a defamation claim, the plaintiff must demonstrate: (1) the statement was false; (2) the defendant communicated it to another person; and (3) the defendant acted negligently or with actual malice when he communicated that false statement. *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011). If the allegedly defamatory speech concerns a public figure or a matter of public concern, the plaintiff must prove that the defendant acted with actual malice.[3] *See Senna v. Florimont*, 958 A.2d 427, 443 (N.J. 2008). Otherwise, the plaintiff must merely prove that the defendant was negligent as to the speech's falsity. *See id.* at 444.

Crescenz contends that Capuzzo acted negligently when he failed to ask her to verify the nature of her relationship with Bender. We disagree. In negligence suits, professional writers are "held to the skill and experience normally possessed by members

---

[2] Because this is a diversity suit, we apply New Jersey law in assessing the merits of Crescenz's defamation and false light claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[3] Penguin and Capuzzo maintain, as they did in the District Court, that Crescenz is a limited-purpose public figure because she "thrust herself publicly into Bender's affairs" by participating in a 2004 *Esquire* article about Bender and by attending events with him. Defendants Br. 23. They thus contend that the higher actual-malice standard applies. We do not reach this issue because we agree with the District Court that summary judgment on the lower negligence standard is appropriate.

of that profession." Restatement (Second) of Torts § 580B (1977). Accordingly, the court considers how the author obtained the information at issue in the case, including whether the author had public sources or made personal observations that substantiated the information shared by those sources. *See Berkery v. Kinney*, 936 A.2d 1010, 1012 (N.J. Super. Ct. App. Div. 2007).

Here, as the District Court found, Capuzzo had ample evidence to infer Bender's sexual relationship with Crescenz. For example, William Fleisher and Richard Walter, who were co-founders of the Vidocq Society and Bender's closest associates, told Capuzzo during several interviews that they believed Crescenz and Bender were long-term sexual partners. In handwritten notes given to Capuzzo, Jan Bender stated that Crescenz and Bender often spent "all night dancing and singing," and that Crescenz was "[a]lso know[n] as the other wife." 965A. Furthermore, a 2004 *Esquire* magazine article, which Capuzzo had read while working on his book, stated that Bender's wife Jan knew "all about" Bender's many girlfriends, including "Joan [Crescenz], Frank's assistant and 'second wife.'" 254A. Perhaps most significantly, Bender himself told Capuzzo that he regularly had sex with Crescenz, and Bender repeated through the course of this litigation—in deposition, via affidavit, and in Crescenz's presence—that they were sexual partners.[4] Having learned of the relationship from the proverbial horse's mouth, it was

---

[4] As the District Court noted, Bender's deposition and affidavit about his relationship with Crescenz is irrelevant here, as this case involves Capuzzo's state of mind and Penguin's knowledge before publication. However, the deposition and affidavit

reasonable for Capuzzo not to seek further verification from Crescenz. Indeed, Capuzzo had no reason to disbelieve Bender's account of his sexual relationship, especially in light of corroborating statements made by those who knew Bender best.[5] *Cf. Vanderberg v. Newsweek, Inc.*, 507 F.2d 1024, 1028 (5th Cir. 1975) (finding, in an actual-malice case, that it is nonetheless reasonable for an author, "without a high degree of awareness of [the facts'] probable falsity, [to] rely on statements made by a single source even though they reflect only one side of the story . . . .") (internal quotation marks and citation omitted). Nor does the record show that Capuzzo was ever informed during his research and writing that Crescenz and Bender were not in a sexual relationship.

Capuzzo's own observations also bolstered his conclusion. During the seven years he worked on *The Murder Room*, he witnessed Crescenz accompanying Bender to various social functions. Capuzzo was aware that the two shared hotel rooms with single beds on multiple occasions, which led to the reasonable inference that they had a sexual relationship. Indeed, in her deposition, Crescenz herself admitted it would be reasonable to conclude a man and woman were having a sexual relationship if they stayed together

---

could be used to rebut Crescenz's claim that the book's characterization of the relationship was false. *See* Fed. R. Evid. 804(6). The issue of whether Capuzzo's statement is false would have been one for the jury if Crescenz survived summary judgment. *See Anderson*, 477 U.S. at 248.

[5] Crescenz contends that Capuzzo admitted doubt about Bender's credibility. Crescenz Br. 35 (citing 409–11A). This is a mischaracterization: in the very passage Crescenz cites for this proposition, Capuzzo stated that Bender "honored little" in his

in a hotel room. Despite her awareness that "other people were thinking [they] were having sex," she continued to share a room with Bender. 212A. Crescenz neither provided evidence to contradict these sources of information nor raised any reason to question their veracity.

In response to Capuzzo's arguments, Crescenz cites four facts that she contends render summary judgment inappropriate. First, she points out that she sent an email to Penguin days before the book's publication, which raised potential inaccuracies about her characterization. As the District Court found, however, Crescenz's email neither explicitly denied a sexual relationship nor provided evidence, other than her personal concerns, to discredit Capuzzo's reporting. Second, Crescenz notes that *The Murder Room* contained two factual misstatements—that detective Keith Hall attended a specific meeting with Richard Walter, and that the book mistakenly attributed the practice of Chinese foot binding as "Japanese"—which call into question Capuzzo's accuracy and care as a writer. But as the District Court held, these stray facts have no bearing on Capuzzo's conclusion that Crescenz and Bender were sexually involved, and "do not cast a net of unreasonableness over the undisputed facts upon which Capuzzo based his depiction of Bender's relationship with Crescenz." 44A. Third, Crescenz submits that Jan Bender's handwritten notes did not specify that Bender had sex with Crescenz. This

personal life, but had "complete honesty about his [sexual] affairs." 411A. Accordingly, he refused to "characterize [Bender] . . . as not trustworthy in a universal sense." *Id.*

9

argument, too, is unavailing, as the notes stated that Crescenz was "[a]lso know[n] as the other wife," and that Crescenz and Bender often drank and danced all night after Jan had gone to bed. 965A. Although Jan's notes did not explicitly state that Crescenz and Bender were sexual partners, they hardly constituted a denial. Finally, Crescenz notes that another biography of Bender, *The Crooked Nose* by Ted Botha, did not mention that she and Bender were sexually involved. This is due to the fact, she contends, that Botha asked her about a sexual relationship, which she denied.[6] Botha's decision not to report the relationship or to focus on other areas of Bender's life does not condemn Capuzzo's statements. Similarly, Botha's choice to interview Crescenz does not render Capuzzo's failure to do so negligent—especially given the wealth of information Capuzzo possessed.

We acknowledge, as Crescenz correctly notes, that summary judgment in negligence cases is generally "rare as a blue rose," *De Palma v. Dorn*, 91 A.2d 261, 262 (N.J. Super. Ct. App. Div. 1952), because "the issue of a defendant's state of mind does not readily lend itself to summary disposition." *Maressa v. N.J. Monthly*, 445 A.2d 376, 387 n.10 (N.J. 1982) (internal quotation marks and citation omitted). In some situations, however, "[p]ublic policy considerations favor the use of summary judgment motions to eliminate baseless defamation claims." *Feggans v. Billington*, 677 A.2d 771, 777 (N.J.

---

[6] According to Crescenz's deposition, Botha never asked her whether she had a sexual relationship with Bender; rather, "[h]e was hemming and hawing, was there a relationship between [Crescenz] and Frank, other than professional." 445A.

10

Super. Ct. App. Div. 1996); *see also Costello v. Ocean Cnty. Observer*, 643 A.2d 1012, 1018 (N.J. 1994) ("Summary judgment is . . . an important tool for disposing of non-meritorious libel lawsuits."); *Sisler v. Gannett Co.*, 516 A.2d 1083, 1104 (N.J. 1986) (Garibaldi, J., concurring) ("[M]any commentators agree that a motion for summary judgment should be no less available under a negligence standard than under the [actual-malice] standard.").

Here, we agree with the District Court that summary judgment is appropriate because Capuzzo possessed overwhelming evidence of a sexual relationship between Bender and Crescenz, and because Crescenz has failed to refute that evidence. Even if a jury could credit Crescenz's testimony and find the allegations of a sexual relationship false, no reasonable jury could find that Capuzzo was negligent in ascertaining the truth of his statements. Accordingly, the District Court did not err in granting summary judgment to Capuzzo on Crescenz's defamation claim.

### B

Crescenz also challenges the District Court's finding that Penguin acted reasonably in relying on Capuzzo's work. Specifically, she contends that her email informing Shinker of inaccuracies in the book triggered a duty for Penguin to independently fact-check the book before publication. Again, we disagree.

As the District Court noted, publishers do not customarily employ fact-checking staff for non-fiction books, but rely instead on their authors to warrant the truth of the

words they write. *See* Restatement (Second) of Torts § 580B ("Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling."). In his deposition, Shinker testified that none of the four publishers for whom he had worked employed fact-checking staff, and that it would be unsustainable, given the hundreds of manuscripts Penguin published each year, for it "to contact every source and confirm every fact in a 120,000-word book manuscript." 159A. Additionally, Penguin took further steps in accordance with industry norms: it voluntarily provided galley copies of *The Murder Room* to Bender's daughter and two of his close associates in the Vidocq Society, none of whom took issue with the depiction of Bender and Crescenz's sexual relationship, and it also had the book vetted by seasoned outside counsel prior to publication. Crescenz does not dispute that Penguin followed industry practice, but rather contends that her pre-publication concerns required Penguin to follow-up on the alleged inaccuracies. She does not, however, provide evidence that such a duty exists in the publishing industry. Further, as noted before, her email to Shinker was vague, failed to deny a sexual relationship, and was devoid of corroborating evidence.

Crescenz maintains that Penguin had a duty to take further investigatory steps after her email, as at that point it "had, or should have had, substantial reasons to question the accuracy of the articles or [the author's] *bona fides . . . .*" *Geiger v. Dell Pub. Co.*, 719 F.2d 515, 518 (1st Cir. 1983) (internal citation omitted). But Penguin had no reason to

doubt Capuzzo's work; Capuzzo was a well respected journalist and best-selling author, who had been nominated several times for a Pulitzer Prize. As discussed above, Capuzzo's extensive research, the culmination of seven years of personal observation and interviews, supported his conclusion that Bender and Crescenz were sexual partners. Crescenz, on the other hand, has been able to identify only two factual inaccuracies in the course of this litigation, neither of which is relevant to her relationship with Bender.

Accordingly, like the District Court, we find no dispute of material fact as to whether Penguin acted reasonably in following industry custom and relying on Capuzzo's warranties. Penguin acted like any other conscientious publisher in releasing *The Murder Room*: it did not have a duty to independently investigate the book's facts, relied on a reputable author, and had the book vetted by experienced outside counsel. Thus, Penguin is entitled to summary judgment on Crescenz's defamation claim as a matter of law.

C

Under New Jersey law, a plaintiff may recover for "publicity that unreasonably places [her] in a false light before the public" upon showing two elements: (1) the false light would be highly offensive to a reasonable person; and (2) the defendant had knowledge or acted in reckless disregard of the statement's falsity. *Romaine v. Kallinger*, 537 A.2d 284, 289–90 (N.J. 1988). Here, because Penguin and Capuzzo were not negligent, it follows *a fortiori* that Crescenz could not establish the higher standard of

recklessness. *Cf. Marcone v. Penthouse Int'l Magazine For Men*, 754 F.2d 1072, 1089 (3d Cir. 1985) (negligence is a lower standard of fault than recklessness). Accordingly, Crescenz's claim for false light fails.

## III

For the reasons stated, we will affirm the judgment of the District Court.